**FUTURA DEVELOPMENT CORPORATION, Plaintiff, Appellant,**

v.

**CENTEX CORPORATION, et al., Defendants, Appellees.**

No. 84–1372.

United States Court of Appeals, First Circuit.

Heard Feb. 7, 1985.

Decided April 30, 1985.

Jay A. Garcia-Gregory, Hato Rey, P.R., with whom Francisco De Jesus Schuck, Salvador Antonetti-Zequeira, Maria Del Carmen Taboas, Fiddler, Gonzalez & Rodriguez, Hato Rey, P.R., Marshall Simmons, P.C. and Jenkens & Gilchrist, Dallas, Tex., were on brief, for defendants, appellees.

Before COFFIN, Circuit Judge, WISDOM,* Senior Circuit Judge, and BOWNES, Circuit Judge.

BOWNES, Circuit Judge.

Appellant-plaintiff, Futura Development Corporation, claims that Centex Corporation and various of its subsidiaries, officers, and directors defrauded it of payment on a promissory note and seeks to recover its losses via § 10(b) of the Securities Exchange Act of 1934 and its implementing Rule 10(b)(5), 17 C.F.R. § 240.10b–5 (1984); § 17(a) of the Securities Act of 1933; and Puerto Rico law. The district court dismissed Futura's suit, finding that: its fraud claims were barred by the statute of limitations; the promissory note was not a security within the context of the federal securities laws; § 17(a) of the Securities Act of 1933 did not provide a private cause of action; the misrepresentation by Chestnut Corporation, a subsidiary of Centex, if any, was not material; and that Futura could have and should have brought, at least, the commonwealth law fraud claims in its prior commonwealth court action and is now barred by res judicata and collateral estoppel from litigating them in federal court. We affirm the district court's decision on the grounds that the plaintiff's claim does not come within the ambit of the federal securities laws and that the Puerto Rico law claims are barred by res judicata.

I. FACTUAL SETTING

This is a tale in which, at every stage in the action, the plaintiff has proved to be its own worst enemy. The factual origins of this case date back to early 1975 when Futura, a Puerto Rico real estate development company, entered negotiations with Chestnut, a wholly owned subsidiary of

Harry E. Woods, Hato Rey, P.R., with whom Geoffrey M. Woods and Woods & Woods, Hato Rey, P.R., were on brief, for plaintiff, appellant.

* Of the Fifth Circuit, sitting by designation.

Centex, to sell a tract of land suitable for the development of residential units in Rio Grande and Canovanas, Puerto Rico. Chestnut originally offered to buy a portion of the land (hereinafter referred to as Section One) consisting of approximately 108.0671 cuerdas (about 100 acres) for $1.3 million, but Futura refused to sell the portion separately because the tract was worth more as a whole than it would have been if subdivided. Thereafter, in April of 1975, Futura and Chestnut entered into a sales agreement of the whole tract for $4,584,713.70. The sale was structured so that Futura received the purchase price in three ways: $1.3 million was paid in cash at the time of the sale; Chestnut assumed a mortgage that Futura had previously taken on the tract for $1.8 million; and Chestnut gave Futura a promissory note for the remaining $1.4 million secured by a mortgage on the property.

## A. *The Sales Agreement*

The note provided that Chestnut would pay the principal plus 9% annual interest in two installments. The first installment of $742,356.85 was payable approximately four years later, on February 1, 1979, and the remaining $742,356.85 was payable the following year on January 31, 1980. The note provided that if Chestnut failed to pay the principal and interest and did not cure the default within thirty days, Futura could accelerate the unpaid balance. The note also provided that *Chestnut was relieved of all personal liability on the note* and that Futura or any subsequent holder would never institute proceedings or actions to enforce personal liability against Chestnut. Although not collectible in a personal action, the note was secured by a mortgage.

The mortgage agreement, obviously executed with a view towards Chestnut's development and eventual resale of the property, gave Chestnut the right to periodically procure releases of portions of the property from the mortgage. Futura agreed to release Section One (the 108.067 cuerdas Chestnut originally sought to buy separate-

ly) without any further payment to Chestnut regardless of whether Chestnut was in default on the promissory note. Chestnut could seek release of the other portions of the property, consisting of five parcels ranging in size from seventeen to twenty-six cuerdas, in a specified order upon payment of approximately $16,825 per cuerda so long as Chestnut was not in default.

In the event of default, the mortgage agreement provided that the property subject to the mortgage could be foreclosed by summary proceedings. To facilitate foreclosure Chestnut waived reappraisal; the mortgage agreement declared that the property would be deemed to be worth the total amount for which the property was mortgaged at the time of foreclosure. The mortgage agreement stated, as the promissory note did, that Chestnut was never to be personally liable for any payment.

Finally, Futura agreed to subordinate its mortgage to a $10 million mortgage and $700,000 mortgage made out in bearer form so that Chestnut could obtain loans for the development and improvement of the property. The Futura-Chestnut mortgage agreement stated that any loan resulting from Chestnut's use of the superior bearer mortgage notes could be used only for development and improvement of the tract. The agreement also provided that if Section One were released Futura's mortgage would become superior to the bearer mortgages on the remainder of the property (hereinafter referred to as Section Two).

## B. *Default*

On February 1, 1979, Chestnut failed to pay the first installment due on the note. According to an affidavit of the Executive Vice-President of Futura, Futura, upon inquiry, was told that Centex and another of its subsidiaries would assume and guarantee payment. Futura was also allegedly told by two Centex codefendant employees that a check was in process. On February 9, 1979, Futura executed a release for Section One and its lien position on the remainder of the property was elevated pursuant to the mortgage agreement. On February

21, 1979, Chestnut paid off the $1.8 million note and retired the mortgage it had assumed at the time it bought the property from Futura. The upshot of the 1979 reshuffling was that Section One was encumbered by a first lien of $10 million and a second lien of $700,000 (the bearer mortgages). The remainder of the tract was subject to a first mortgage lien of $700,000, a second mortgage lien of $1.4 million (Futura's mortgage) and a third mortgage lien of $10 million.

February 1979 passed and the check that was supposedly in process never arrived. Futura again demanded payment by letter in March 1979 but received no satisfaction. In January 1980 Chestnut defaulted on the second installment of the promissory note due Futura.

### C. The Lawsuits

A year and three months after the 1979 default (three months after the 1980 default) Futura filed suit against Chestnut and two unnamed agents of Chestnut in Puerto Rico Superior Court to collect the principal and interest due from Chestnut personally despite the nonliability provision and its promise not to institute court proceedings. In addition, Futura sought to foreclose on the mortgage and to set aside the $700,000 mortgage which was superior to it in rank.[1]

After the commonwealth lawsuit commenced, Futura and Chestnut/Centex conducted several suit-related negotiation meetings. During a meeting in October of 1981, Jack McDonald, President of Centex, informed the President of Futura that neither Centex nor Chestnut had ever intended to pay the balance of the purchase price. Futura claims it was at this point that the scales fell from its eyes and it first realized that in order to obtain Section One, Centex had only pretended to want to buy the entire tract. Despite this apparent revelation, Futura continued to press its common-

wealth court action which was premised on the validity of the sales contract and mortgage agreement and made no attempts to amend its complaint or alter the focus of the action.

Meanwhile, on March 26, 1982, Futura filed suit in the United States District Court alleging various federal and commonwealth causes of action based on the contention that Chestnut and Centex had defrauded Futura of the unpaid balance of the sales price. On July 10, 1982, Futura cross-moved for summary judgment in the Puerto Rico Superior Court, seeking a determination that Chestnut was personally liable under the contract because personal nonliability provisions were against public policy.

On December 3, 1982, the Puerto Rico Superior Court held that the nonrecourse provisions in the mortgage agreement and promissory note were legally binding and that Futura's remedy was limited to foreclosure on Section Two of the tract. The Superior Court's judgment was affirmed by the Puerto Rico Supreme Court on January 27, 1983.

With the dimming of the lights on its contract action, Futura concentrated its energy on the claim of fraud before the district court.

## II. PROCEDURAL CHALLENGES

■ In ruling on the motion for dismissal, the district court considered affidavits and papers apart from the pleadings and properly treated the motion as one for summary judgment. Fed.R.Civ.P. 12(b). Futura contends, however, that the district court considered Spanish language documents generated in the commonwealth foreclosure action in contravention of Rule 6 of the Local Rules of the Puerto Rico District Court which requires that all documents be translated into English unless the court otherwise orders. We reject this attempt to take advantage of a technicality. Futura does not deny that it participated in

---

1. Futura claimed that the $700,000 bearer mortgage should be set aside because the loan it secured had been provided by another Centex subsidiary to finance improvements on a farm that was located on Section One. Since Futura had released Section One it apparently felt, on some sort of marshalling theory, that the $700,000 mortgage should not apply to Section Two.

producing the documents, nor does it deny that Spanish is its language of customary use and the native language of the judge that heard the case. *See Federal Deposit Insurance Corp. v. Coll Gonzalez,* 729 F.2d 46, 47 (1st Cir.1984). Moreover, Futura did not complain about the absence of translations until after the district court had rendered a judgment against them and translations were supplied by appellees less than three weeks later.

We have also considered Futura's claim that the district court judge should have recused himself from the case because of alleged personal bias against Futura's attorney and find it to be without merit.

## III. THE FEDERAL SECURITY–NOTE CLAIMS

Futura claims that Centex represented during the contract negotiations and in the promissory note that it intended to buy the entire tract when, in fact, it did not and that such representations constituted fraud in connection with the purchase and sale of a security. Centex argues, and the district court found, that the promissory note involved in this sale was not a "security" within the protection of the federal security laws.

In examining the question of subject matter jurisdiction over the federal securities claims the district court properly treated Centex's motion to dismiss as a motion on the merits rather than a 12(b)(1) motion to dismiss for lack of jurisdiction since the basis of jurisdiction was also an element of the plaintiff's cause of action. *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946); *Williamson v. Tucker,* 645 F.2d 404, 415 (5th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981). In reviewing the district court's finding that there was no jurisdiction under the securities laws, we examine the record in the light most favorable to the party opposing the motion, indulging all inferences favorable to this party. *Williamson v. Tucker,* 645 F.2d at 416.

Discussion of the antifraud coverage of the securities acts necessarily begins with the definitions of "security" under the 1933 and 1934 Acts. Section 2(1) of the 1933 Securities Act and section 3(a)(10) of the Exchange Act of 1934 offer essentially identical definitions and provide:

> When used in this subchapter, unless the context otherwise requires—
>
> (1) The term "security" means any note ... investment contract ... or, in general, any interest or instrument commonly known as a "security."

15 U.S.C. §§ 77b(1); 78c(a)(10) (1982).[2] The only statutory limitation on the scope of the definition of security is an exemption for notes with a maturity of less than or equal to nine months that is contained in the 1934 Act. 15 U.S.C. § 78c(a)(10). The note executed in the sale of the tract clearly comes within the literal language of the federal securities laws.

Nonetheless, the Supreme Court has held that the name given to an instrument is not dispositive, stating that "in providing definitions Congress did not attempt to articulate the relevant economic criteria for distinguishing securities from non-securities." *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 847, 95 S.Ct. 2051, 2058, 44 L.Ed.2d 621 (1975). In *Forman,* the Court declined to find shares of "stock" in a cooperative housing project that were purchased by tenants as a prerequisite to living in the cooperative and were redeemable for the price paid when the tenant vacated, to be "shares" or "investment contracts" within the meaning of the federal securities laws. The Court examined the substance of the transaction and determined that the purchasers were interested in procuring a place to live, not investing money in a common enterprise for profits resulting from the efforts of others. *Id.* at

---

**2.** Despite occasional differences in wording, definitions of "security" contained in the 1933 Act and the Exchange Act of 1934 are treated as functionally equivalent. *See United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 847, 95 S.Ct. 2051, 2058, 44 L.Ed.2d 621 (1975); *Ballard & Cordell Corp. v. Zoller and Danneberg Exploration, Ltd.,* 544 F.2d 1059 (10th Cir.1976), *cert. denied,* 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1060 (1977).

852, 95 S.Ct. at 2060. *See also SEC v. W.J. Howey,* 328 U.S. 293, 302, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946).

■ While *Forman* involved investment contracts rather than notes, it is now generally understood that courts must examine the substance or "economic realities" of all alleged securities transactions and not rely on the form of the instrument to determine whether the transaction falls within the ambit of the federal securities laws. *See Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967); *Union Planters National Bank of Memphis v. Commercial Credit Business,* 651 F.2d 1174, 1180–81 (6th Cir.1981); *SEC v. World Radio Mission, Inc.,* 544 F.2d 535, 537–38 (1st Cir.1976). A number of courts of appeals have found that not all "notes" are securities although they are within the literal definitions of the Acts. *See, e.g., United American Bank of Nashville v. Gunter,* 620 F.2d 1108 (5th Cir.1980); *Lincoln National Bank v. Herber,* 604 F.2d 1038 (7th Cir.1979); *Emisco Industries, Inc. v. Pro's Inc.,* 543 F.2d 38 (7th Cir. 1976); *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252 (9th Cir.1976); *C.N.S. Enterprises v. G. & G. Enterprises, Inc.,* 508 F.2d 1354 (7th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975).

■ In determining the scope of the definition of "security" for purposes of the antifraud provisions of the security laws, we are guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes. The Security Exchange Act quite clearly falls into the category of remedial legislation. One of its central purposes is to protect investors through the requirement of full disclosure by issuers of securities....

*Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967) quoting *SEC v. W.J. Howey Co.,* 328 U.S. 293, 298, 66 S.Ct. 1100, 1102, 90 L.Ed. 1244 (1946). Federal securities laws enacted for the purpose of protecting against fraud must be construed flexibly to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits. *SEC v. W.J. Howey Co.,* 328 U.S. at 299, 66 S.Ct. at 1103; *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 92 (5th Cir.1975).

On the other hand, we do not believe that Congress intended that all business transactions involving notes be viewed as the purchase and sale of a security. Many note transactions involve loan agreements, sales agreements, deeds of trust, mortgages, and personal security agreements which are governed by federal laws such as the Truth in Lending Act, 15 U.S.C. § 1601 (1982), the Magnuson-Moss Warranty Act, 15 U.S.C. § 45 (1982), and the antitrust laws and state laws such as the Uniform Commercial Code and state unfair and deceptive acts and practices statutes. Regulation of some note transactions, it is only logical to assume, should be left to the operation of these other laws. *See Woodward v. Metro Bank of Dallas,* 522 F.2d at 91. *Cf. Marine Bank v. Weaver,* 455 U.S. 551, 556, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409 (1982) (certificates of deposit). Moreover, the securities laws involve elaborate registration and financial reporting requirements. While we do not believe that every security which may be subject to the antifraud provisions is necessarily a security for registration purposes, the expansion or contraction of the definition of security in one area certainly has ramifications for other areas of regulation. Obviously, subjecting the maker of every note to the reporting requirements of the 1933 Securities Act would paralyze the business community rather than assist in the free flow of capital as Congress intended. *Zabriskie v. Lewis,* 507 F.2d 546, 551 (10th Cir.1974); *Bellah v. First National Bank of Hereford, Texas,* 495 F.2d 1109, 1114 (5th Cir. 1974). Thus, despite our firm support of the creative use of Rule 10b(5) and other antifraud provisions of the Securities Acts in thwarting fraudulent schemes, we recognize that there must be some limits on the scope of these provisions.

In assessing the economic realities of a transaction, different circuits have adopted

varying approaches for determining whether a note is a security. The most widely adopted test is the "commercial vs. investment" test espoused by the Third, Fifth, Seventh and Eleventh Circuits and more or less employed in spirt in *Forman*. Under this test, the court looks to see whether a transaction more closely resembles typical investment situations or typical mercantile or commercial transactions to determine the applicability of the security laws. The "investment vs. commercial" approach focuses on the degree to which the plaintiff is dependent upon the expertise and efforts of others. *See, e.g., Emisco Industries v. Pros Inc.*, 543 F.2d 38; *C.N.S. Enterprises v. G. & G. Enterprises*, 508 F.2d 1354; *Bellah v. First National Bank of Hereford, Texas*, 495 F.2d 1109.

The second test, developed by the Sixth and Ninth Circuits, focuses on whether the transaction more closely resembles a "loan" or has the risk factors associated with "risk capital." *See Union Planters National Bank v. Commercial Creditor*, 651 F.2d at 1182; *Great Western Bank and Trust Co. v. Kotz*, 532 F.2d 1252. This approach considers six factors: the length of time between the note's issuance and due date, whether there is collateral for the note, the form of the obligation, the circumstances of the issuance, the relationship between the amount borrowed and the size of the borrower's business, and the contemplated use of the proceeds. *Great Western Bank and Trust v. Kotz*, 532 F.2d at 1257-58.

The Second Circuit has developed what is referred to as the "literal approach." It interprets the language of the Securities Acts to require that the court presume that a "note" is a security and only exempts it from the Acts "if the context requires otherwise." In determining whether the context requires treatment of a note as a nonsecurity, the Second Circuit looks to see if the transaction at issue bears a strong "family resemblance" to transactions that

it assumes were not intended to be covered by the securities laws. Transactions which the Second Circuit believes are clearly outside the Acts include: notes given in connection with home mortgages, consumer financing, short-term liens on small businesses, and short-term notes secured by accounts receivable. *See Chemical Bank v. Arthur Andersen and Co.*, 726 F.2d 930 (2d Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984); *Exchange National Bank v. Touche Ross and Co.*, 544 F.2d 1126 (2d Cir.1976.) As might be expected, the conceptual basis of the three tests and the considerations examined by the courts in applying the tests tend to be very similar although the focus is slightly different.

While this court has not previously taken a formal position as to the most appropriate approach for determining if a note is a security under the securities laws, in *SEC v. World Radio Mission, Inc.*, 544 F.2d 535 (1st Cir.1976), we focused on the transactional elements of a loan plan including "the character of the instrument given in commerce by the terms of the offer; the plan of distribution, and the economic inducements held out to the prospect."[3]

### A. The "Investment vs. Commercial" Focus is Most Appropriate

■ The federal securities laws were enacted for the purposes of restoring investor's confidence in financial markets, *Marine Bank v. Weaver*, 455 U.S. at 555, 102 S.Ct. at 1223, reducing transaction costs associated with a caveat-investor rule, H.R. Rep. No. 1383, 73d Cong., 2d Sess. 4–5 (1934), and enhancing the free flow of capital, *Daily v. Morgan*, 701 F.2d 496, 500–02 (5th Cir.1983). We believe that the investment/commercial test can best effectuate these purposes because it directly focuses on the investor's dependency on the efforts of others and the investor's dependency upon financial disclosures provided by the

**3.** In *Manchester Bank v. Connecticut Bank and Trust Co.*, 497 F.Supp. 1304 (D.N.H.1980), the United States District Court for the District of New Hampshire surveyed the various circuits' approaches and applied the investment/commercial test to determine whether a loan participation agreement was a security within the Acts.

other party. Since the securities laws were designed to offer protection through disclosure, an assessment of the need for disclosure is obviously important in determining the need for coverage under the Acts. The risk capital approach focuses on the riskiness of the venture. Many investments, however, such as those involving markets in commercial paper are specifically designed to be low risk, yet such transactions were clearly intended by Congress to fall within the Acts. Moreover, the focus on the riskiness of the venture does not readily incorporate the disclosure needs of borrowers as well as lenders. The "literal approach" adopted by the Second Circuit presumes coverage unless a transaction resembles a clear example of a nonsecurity. We must note, however, that the Supreme Court in the context of investment contracts and certificates of deposit has examined the positive indicia of investment rather than negating a presumption of coverage. *See Marine Bank v. Weaver*, 455 U.S. at 556–59, 102 S.Ct. at 1223–25; *United Housing Foundation, Inc. v. Forman*, 421 U.S. at 856–60, 95 S.Ct. at 2062–65. Finally, the proposed official draft of the federal securities laws appears to endorse the investment/commercial approach by excluding from the definition of security a "note or evidence of indebtedness issued in a primarily mercantile or consumer, rather than investment, transaction not involving a distribution." 1 ALI, *Federal Securities Code*, § 299.53(a), (b)(3) (1980). Thus, after considering the three judicial approaches for deciding whether a note is a security, we hold that the investment/commercial test is the most appropriate approach for determining whether a note comes within the protection of the securities laws.

■ In determining whether a note was given for investment rather than commercial purposes strong consideration must be given to: the size of the offering; whether there is, by necessity, reliance on the expertise of the issuer; the purpose of the issuer in executing the note and the payee in accepting the note; and the economic inducements held out to the prospect. *See Marine Bank v. Weaver*, 455

U.S. at 556, 102 S.Ct. at 1223; *Williamson v. Tucker*, 645 F.2d 404; *McClure v. First National Bank of Lubbock, Texas*, 497 F.2d 490, 493–94 (5th Cir.1974) (en banc), *cert. denied*, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975). Other considerations may also be relevant in a particular case such as: the degree to which the profit on the note is in the hands of the maker rather than the payee; whether the object of the holder was to acquire an interest in the property or enterprise; whether the note was primarily commercial because it was serving as a "cash substitute" for the purchase price; and whether the return on the note was predetermined or could reasonably be anticipated, or was subject to the managerial efforts of the maker. *See, e.g., C.N.S. Enterprises, Inc. v. G. & G. Enterprises, Inc.*, 508 F.2d at 1360–62.

### B. *Application to the Futura Note*

■ The facts strongly suggest that this note was generated in a commercial rather than an investment transaction. First, the note was given as a result of one-on-one business negotiations that culminated in a complicated "tailor made" sales agreement. This was not the type of offering that is typical of a securities transaction. Second, the note was for a definite amount with a predetermined rate of interest. In this respect the note served as a cash substitute for the sales price. Finally, the note's stated value was in no way dependent upon the entrepreneurial efforts of Chestnut, Centex, or any of their associated companies.

Because the note was only part of the loan transaction, we must also consider the terms of the mortgage agreement. Pursuant to the agreement, Futura took the note without personal recourse against Chestnut. The value of the land was the sole measure of Chestnut's legal obligation on the note. The value of the land which was artificially fixed by the mortgage agreement as the total amount for which the property was mortgaged, was the sole measure of Chestnut's legal obligation on the note. Thus the value of Futura's collateral depended, in part, upon the nature

of the improvements made by Chestnut. Futura's agreement to subordinate its mortgage lien to construction and improvement mortgages heightened its dependence upon Chestnut's construction plan. This apparent reliance upon the efforts of others is some support for the claim that the note should be considered an investment security. To the extent, however, that Futura was "investing" in the property with the expectation that it would increase in value rather than merely seeking a repayment of the loan, it would have gotten what it bargained for when the property was foreclosed on default of the note. Futura, therefore, would not have been defrauded by Centex's alleged plan not to pay the note.

If, on the other hand, as Futura strenuously argues, it did not view the value of the property as the measure of the value of the note, then the transaction was nothing more than a typical example of a seller assisting the buyer in purchasing real estate by offering a cash substitute financing plan. We do not believe that Congress intended run-of-the-mill real estate transactions to be governed by the Securities Acts. *See United Housing Foundation v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621; *Williamson v. Tucker,* 645 F.2d at 429; *Altman v. Knight,* 431 F.Supp. 309 (S.D.N.Y.1977); *Van Arsdale v. Claxton,* 391 F.Supp. 538 (S.D.Cal.1975). Since we must assume for the purposes of review of the district court's dismissal that Futura's allegations of misrepresentation and reliance are true, we find that the note involved was not an investment security within the meaning of "security" in the 1933 and 1934 federal securities acts and, accordingly, affirm the dismissal of Futura's federal claims for lack of subject matter jurisdiction.

4. Centex argues that the federal security claims were also barred by res judicata. Because we have held that there is no federal subject matter jurisdiction over the securities claims, we need not determine whether Puerto Rico's res judicata statute would preclude claims that can only be brought in federal court. *See Marrese v. American Academy of Orthopaedic Surgeons,*

## IV. STATE LAW CLAIMS

The district court dismissed Futura's commonwealth law fraud claims on the basis of res judicata and collateral estoppel.[4] Futura argues that under Puerto Rico law neither res judicata nor collateral estoppel apply because the parties, facts, legal issues, and causes of action alleged in the district court were not those decided in the Puerto Rico Superior Court action.

Res judicata generally binds parties from litigating or relitigating any issue that was or could have been litigated in a prior adjudication and prevents claim splitting. *See Marrese v. American Academy of Orthopaedic Surgeons,* — U.S. —, n. 1, 105 S.Ct. 1327, n. 1, 84 L.Ed.2d 274 (1985); *Capo Sanchez v. Secretary of the Treasury,* 92 P.R.R. 817 (1965); *Restatement (Second) of Judgments* §§ 18, 24 (1982). In Puerto Rico,

> the rule of res judicata is based on considerations of public policy and necessity: on the one hand, the interest of the State in terminating litigations in order that judicial issues may not be perpetuated ..., and on the advisability of impressing court decisions with due dignity ..., and on the other hand, the desirability of not submitting a citizen twice to the inconveniences which the litigation of the same cause entails.

*Perez v. Bauza,* 83 P.R.R. 213, 217–18 (1961).

P.R. Laws Ann. tit. 31, § 3343, Puerto Rico's res judicata statute provides:

> In order that the presumption of the res adjudicata may be valid in another suit, it is necessary that, between the case decided by the sentence and that in which the same is invoked, there be the most perfect identity between the things, causes, and persons of the litigants, and their capacity as such.[5]

— U.S. —, — – —, 105 S.Ct. 1327, 1330–34, 84 L.Ed.2d 274 (1985).

5. In addition, Puerto Rico's Code of Civil Procedure, P.R. Laws Ann. tit. 32, § 1793 provides:
 The effect of a judgment or final order ... before a court or judge of Puerto Rico, or of the United States, having jurisdiction to pro-

## A. *Identity of Parties*

Futura first argues that res judicata cannot bar this case because § 3343 requires a perfect identity of parties and the parties in the commonwealth court action are not identical to the parties in this action. Specifically, Futura was joined in the commonwealth court contract action by Woodville Company, an assignee of a partial interest in Futura's note. Woodville has not thrown its hat into the ring a second time. Futura also alleges that the federal action involves different defendants. In addition to the commonwealth court defendants (Chestnut and two unnamed individuals believed to be holders of the mortgage note), Futura has named Centex, the alleged parent of Chestnut; two other Centex subsidiaries; and eight individual codefendants who, while agents for Centex, committed one or more of the actions Futura alleges resulted in the fraud.

■ The literal language quoted by Futura appears to provide it with a toehold, but this is completely eroded by the subsequent provision of § 3343 that Futura did not quote:

> It is understood that there is identity of persons whenever the litigants of the second suit are legal representatives of those who litigated in the preceding suit, or when they are jointly bound with them or by the relations established by the indivisibility of prestations among those having a right to demand them, or the obligation to satisfy the same.

Identity of parties and interest is required so that a party's rights and obligations will not be determined without their knowledge or an opportunity for participation. There is no such danger here, for Futura was an active participant in the state court action. In *Republic Security Corp. v. Puerto Rico Aqueduct and Sewer Authority*, 674 F.2d 952, 955–59 (1st Cir.1982), we found that under Puerto Rico law the assignee of a construction contract was precluded from litigating the validity of a contract that had previously been litigated by the assignor. In this case, the absence of the assignee, Woodville, in a subsequent suit by the assignor who was also party to the first suit presents even less justification for the avoidance of res judicata. To find otherwise would be to foster frivolous attempts at relitigation by parties whose previous colitigants are sensible enough to quit after the first adverse decision.

■ We also find unpersuasive Futura's claim that the addition of Centex and various of its subsidiaries and agents changes the parties in interest sufficiently to bar the application of res judicata. In *De Leon v. Colon*, 42 P.R.R. 21 (1931), the Puerto Rico Supreme Court held that the plaintiff could not relitigate after a suit had been determined by a final judgment although the plaintiff had joined additional defendants to the principal defendant in the second suit. In this case, we cannot see how the additional parties named in the fraud claims can be distinct defendants and also be potentially liable for the loss Futura claims to have suffered by entering the mortgage agreement with Chestnut. Clearly, whatever part Centex and its agents and subsidiaries played in defrauding Futura was undertaken through Chestnut; Futura has not alleged that it negotiated the note and mortgage/sales agree-

nounce the judgment or order is ... in respect to the matter directly adjudged, conclusive between the parties and their successors in interest by title ... litigating for the same thing under the same title and in the same capacity, provided they have notice, actual or constructive of the pendency of the action or proceeding.

......

Article 1204 of the Civil Code [P.R. Laws Ann. tit. 31, § 3343] and Article 42 of the Code of Civil Procedure [P.R. Laws Ann. tit. 32, § 1793]—reflect different legal traditions.

The first is taken from Articles 1251 and 1252 of the Spanish Civil Code; the latter has its immediate origin in California. Nevertheless, the Supreme Court of Puerto Rico has expressly held in *Lausell·Marxuach v. Diaz de Yanez*, 103 D.P.R. 533, 535 (1975), that "the doctrine of res judicata is ... part of our Civil Law and except for comparative purposes we need not resort to other sources for its analysis."
*Security Republic Corp. v. Puerto Rico Aqueduct and Sewer Authority*, 674 F.2d 952, 955–56 n. 4 (1st Cir.1982).

ment with entities other than Chestnut. Indeed, the theory on which Futura posits the liability of Centex, et al. is an alter ego theory.[6] Futura cannot have it both ways, *i.e.*, claim liability on the basis of an alter ego theory while at the same time denying that the defendants have sufficient identity of interest to benefit from the commonwealth court's adjudication of Chestnut's obligations under the contract. Accordingly, we find that the parties in the commonwealth court action have sufficient identity of interest to be viewed as identical parties within the parameters of P.R. Laws Ann. tit. 31, § 3343.

### B. *Identity of "Things"*

 Futura next argues that res judicata cannot be applied because this action does not involve the same "things" as the commonwealth court action. *See* P.R. Laws Ann. tit. 31, § 3343. The requirement of perfect identity of "things" has been defined as "the object or matter over which the action is exercised." *Lausell Marxauch v. Diaz de Yanez*, 103 P.R.R. 533 (1975) (translation provided without page reference). We think it clear that in both actions the "object" was the contract and the "matter" was the validity of the contract and its provisions. Futura relies on *A & P General Contractors, Inc. v. Associacion Cana, Inc.*, 110 D.P.R. 753, 764–65 (1981), in which the Puerto Rico Supreme Court determined that there is an identity of things only "if when deciding on the object of a complaint, the judge may contradict a prior decision affirming a right arisen or arising from, or a right affirmed by a prior court decision." It argues that the superior court's determination of Futu-

ra's foreclosure rights is not compromised by our finding that the entire sales scheme was a fraud. We do not agree. On a purely practical level it makes no sense for the parties and the court to spend valuable time and resources interpreting a contract if the plaintiff, after an adverse interpretation, can attack the validity of the contract. Secondly, the superior court's decision was premised on the parties' uncontroverted statements that the contract was binding. We, therefore, find an identity of "things."

### C. *Identity of Causes*

Futura also seeks protection in § 3343's requirement that the "causes" be identical in order for res judicata to apply, and argues that its cause of action in federal court is fraud which is clearly distinct from its previous "contract" causes of action in the commonwealth court.

 In *Lausell Marxauch v. Diaz de Yanez*, 103 D.P.R. 533 (1975), the Puerto Rico Supreme Court defined "cause" as

the principal ground, the origin of the actions or exceptions raised and decided, and it must not be mistaken for the means of proof *nor for the legal grounds of the claims adduced by the parties.*

(emphasis added) (translation provided without page reference). Thus, "cause" as used in § 3342 does not prevent res judicata from being applied because a new legal theory of recovery is alleged as the following cases illustrate.

In *Gonzales v. Mendez*, 15 P.R.R. 682 (1898), the Puerto Rico Supreme Court found that where the mother of a minor

---

**6.** The first cause of action alleged in Futura's complaint states:

That upon information and belief, at all times ... co-defendant Centex controlled, directly or indirectly co-defendant [Centex] Homes and S Corporation by means of stock ownership or otherwise and exclusively conducted, managed, dominated and controlled the business affairs of the other corporate co-defendants ... as though they were not in effect separate and distinct corporate entities.... Centex itself and S Corporation in turn controlled directly and indirectly defend-

ant Chestnut.... [U]pon information and belief, all decisions relative to the operation of co-defendant Homes, S. Corporation and Chestnut and/or "X" Corporation were made by co-defendant Centex and for the sole use and benefit of co-defendant Centex.... That upon information and belief *the other corporate co-defendants are in fact alter-egos of co-defendant Centex and that co-defendant Centex and the other corporate co-defendants are one and the same.* (emphasis added).

daughter had unsuccessfully attempted to rescind a conveyance of her daughter's property on the grounds that she was without judicial authority to make the disposition, she could not later seek the annulment of the contract on the grounds that she did not have the *patria potestas* of the daughter since the object of both actions was to recover an inheritance and annul a deed of conveyance. The court held that "[t]he identity of actions necessary to the existence of res judicata is present, although the grounds or reasons for the annulment of the conveyance alleged in such actions are different, when the object of such actions is the same ... [otherwise] the party obtaining a final judgment in his favor would find himself involved in litigation as often as different reasons could be found by fertile imagination, although known when the first action was brought." *Id.* (translation provided without page reference). *See also Manique v. Aguayo*, 37 P.R.R. 314 (1927) ("A judgment on the merits in a former suit between the same parties or their privies on the same cause of action, by a court of competent jurisdiction, operates as an estoppel ... to every ... matter which might with propriety have been litigated and determined in that action.") In *Zambrana v. Superior Court*, 100 P.R.R. 178 (1971), the Puerto Rico Supreme Court again addressed claim splitting and stated:

> The defense of res judicata, in its aspect of splitting of the cause of action, is applicable to every subsequent claim between the same parties relating to the same matter. *Avellanet v. Puerto Rico Express*, 64 P.R.R. 660 (1945); *Cruz v. Ortiz*, 82 P.R.R. 802 (1961). The purpose of this defense is to further the termination of the judicial controversies and to avoid the continuous hardships caused to one party by successively filing various suits related to the same matter.

*Id.* at 179.

██ Futura argues that the fraud cause of action involves different evidence, turns on different facts, and is sufficiently distinct to constitute a different cause and should not be barred under the reasoning of *Gonzalez, Manique* and *Zambrana.* Here again, we find it difficult to view Futura's fraud claims as a creature apart from the earlier action when its federal complaint states that in addition to the fraud claims this case is an "[a]ction for collection of monies ... cancellation of certain mortgages ... assumption of payment of debt; cancellation of subordination of p.m. mortgage; cancellation of release and liberation of land from p.m. mortgage." In the superior court Futura requested "collection of monies, foreclosure of mortgage, and cancellation of mortgage."

Moreover, Futura alleges that the tort damages flowing from the harm caused by Chestnut's misrepresentation comes to the exact amount owing on the purchase and sales agreement, the very relief sought in the previous action. Fraud damages are designed to put the plaintiff in its pretort position. In this case Futura's damages would presumably be the difference between the 1975 fair market value of the land if sold as a single tract and the value it has already received—the $1.4 million down payment plus the $1.8 million release from its original mortgage liability plus any monies Futura can recover in foreclosure. The relief requested by Futura looks less like fraud damages than an attempt to reform an apparently ill-conceived contract. We think that the facts alleged compel the conclusion that the requirements of § 3343 of res judicata have been met in this case.

### D. *Res Judicata is Consistent with the Ends of Justice*

██ Finally, Futura argues that the doctrine of res judicata is not applied under Puerto Rico law if the application would defeat the ends of justice, especially if reasons of public policy are involved. *Millan v. Caribe Motors Corp.*, 83 P.R.R. 474 (1961); *Perez v. Banza*, 83 P.R.R. 213 (1961).

In *Millan v. Caribe Motors*, the Puerto Rico Supreme Court affirmed a superior court judgment allowing a plaintiff to seek

recission of a conditional sales contract although the vendor had previously repossessed plaintiff's purchased truck because of default in payments. The court allowed the second suit to proceed because the plaintiff's consent to repossession in the first suit had been obtained by deceit, there were clear violations of the Puerto Rico Conditional Sales Act in the contract, and the initial repossession action was a summary and special proceeding. In this case none of the public interest or fraud factors are present. Futura initiated both suits and, by its own admission, was aware of the alleged fraud in September or October of 1981 but made no effort to amend its complaint or alter its litigation strategy.[7] Eight months later, in July 1982, Futura moved for summary judgment relying on uncontroverted facts that asserted the validity of the contract. Therefore, Futura cannot avail itself of the *Millan* fraud exception to res judicata. Nor are the public policy implications in *Millan* present in this case. The contract was not the subject of alleged overreaching or oppressive conduct on the part of Chestnut due to its superior bargaining position and the Puerto Rico Supreme Court has already affirmed the legality of the nonpersonal liability and foreclosure provisions contained in the mortgage.

The other exceptions to res judicata that Puerto Rico courts have accepted include situations in which: (1) the prior judgment was rendered pursuant to an invalid acceptance of the claim by the defendant; (2) the prior judgment was entered by a court without jurisdiction; or (3) appeal from the judgment was attempted but could not be accomplished and appellant was not at fault. *See Rodriguez v. Baldrich*, 508 F.Supp. 614 (D.P.R.1981) and cases cited therein. Obviously none of these exceptions is applicable to the facts alleged here. Therefore, we find that Futura's commonwealth court claims are barred by res judicata and affirm the decision of the district court.

7. Futura could have amended its complaint to include a new cause of action pursuant to Puer-

*Affirmed.*

Costs awarded to Centex.

to Rico Rules of Civil Procedure 13.1, 13.4 and 18.