DERAN STEPHEN DINJIAN & others[1] vs. NUBAR DINJIAN
& another.[2]

Middlesex. June 5, 1985 — July 30, 1986.

Present: ARMSTRONG, KAPLAN, & SMITH, JJ.

*Investment Adviser. Consumer Protection Act*, Securities transactions,
Availability of remedy, Businessman's claim, Mortgage of real estate.
*Loan. Words*, "Securities."

In a civil action, the judge, as trier of fact, could properly conclude that
certain short-term notes, paying fixed rates of interest and secured by
second mortgages on real property, evidenced simple loan transactions
negotiated between lender and borrower, rather than transactions in
"securities" governed by Federal and Massachusetts securities laws.
[593-595]

General Laws c. 93A, § 9, as in effect prior to St. 1979, c. 406, § 1,
provided only a consumer protection remedy and afforded no relief to
plaintiffs who alleged that the defendants had engaged in unfair or
deceptive practices in rendering investment advice concerning certain
secured loans by the plaintiffs to commercial real estate developers.
[595-596]

In a civil action, the judge, as trier of fact, could properly conclude that the
defendants, who were members of the plaintiffs' family, had not engaged
in unfairness or deception in connection with certain secured loans by
the plaintiffs to commercial real estate developers. [596-597]

CIVIL ACTION commenced in the Superior Court Department
on October 10, 1978.

The case was heard by *James W. Killam, III*, J., sitting
under statutory authority.

*Theresa A. Kelly (JoAnne Meyers* with her) for the plaintiffs.
*Elliott I. Mishara (Margaret S. Mishara* with him) for the
defendants.

[1] Deran Sarkis Dinjian and Maritza Dinjian, who are the son and wife,
respectively, of Deran Stephen Dinjian.

[2] Karnig Dinjian.

ARMSTRONG, J. The plaintiff Deran Stephen Dinjian (Deran) and his family sued Deran's relatives, Karnig (his brother) and Nubar (a cousin), to recover damages for losses they (Deran and his family) had suffered in second mortgage loans, acting (they say) on investment advice from Nubar and Karnig. The complaint alleges that Nubar and Karnig had acted as investment advisers without having complied with the laws applicable to such activity and that they violated G. L. c. 93A (and perhaps a fiduciary duty owed to the plaintiffs) by failing to disclose facts that might have influenced the plaintiffs not to make the second mortgage loans.[3] The case was tried jury-waived. The judge found for the defendants on all counts.

Nubar and Karnig had been real estate owners or developers in the 1950's but had retired in the 1960's. In the early through middle 1970's they had taken to lending money to other real estate developers and builders. The rates of interest were highly favorable, and the loans were secured by second mortgages on the subject properties. Two regular borrowers were Mac-Davis Begelfer and Victor Iocco, who were partners in construction and the development of real estate. In addition to advancing their own funds, Nubar and Karnig, in the period 1973 through 1976, also placed funds of relatives and close friends. Sometimes, but not always, Nubar and Karnig would accept a loan origination fee from the borrower. They would also take one, one and one-half, or occasionally two percent from the mortgage interest payments as a fee for managing the loans and disbursing the payments to the lenders.

On conflicting evidence the judge found that the plaintiffs' participation in such second mortgage loans was not the result of solicitation by Karnig and Nubar. Rather, the plaintiffs heard about Karnig and Nubar's successes in arranging second

---

[3] The most important of these allegations were that Nubar and Karnig had been paid finders' fees by the borrowers and that they (Nubar and Karnig) failed to disclose other loan transactions between them and the borrowers.

After this case was argued, it was held in *Cabot Corp.* v. *Baddour*, 394 Mass. 720 (1985), that one may not recover under G. L. c. 93A for conduct which violates the Securities Exchange Act of 1934 or the regulations promulgated thereunder.

mortgage loans in the course of casual discussions within the family, as a result of which Deran and his family asked to be kept in mind when opportunities should come up for them to participate.[4] Nubar subsequently telephoned Deran to see if he was interested in making a second mortgage loan of $60,000 to Begelfer and Iocco on a property on Trowbridge Street in Cambridge. Deran was interested, and the loan was eventually made in the names of Deran and his wife. Deran negotiated the terms directly with Begelfer and Iocco, and Deran's attorney handled all the paper work. Nubar and Karnig were not paid an origination fee on the transaction but were designated to handle the collection and disbursement of mortgage payments, for which they were to be paid one percent. (I.e., the interest rate to Begelfer and Iocco was fifteen percent; Deran and his wife would receive fourteen percent.)

Three months later Nubar and Karnig again approached Deran. They were trying to put together a loan in the amount of $150,000 for Begelfer and Iocco. The property to be mortgaged was on Sewall Avenue in Brookline. The interest rate was to be sixteen percent, with Nubar and Karnig holding back one and a half percent for their collection and disbursement services. It was stipulated that Nubar and Karnig did not disclose to Deran (or presumably to other investors) that (1) Begelfer and Iocco were paying them a one percent origination fee ($1,500) for arranging the loan, and (2) they had previously lent a substantial sum to Begelfer and Iocco on the same Sewall Avenue property and had been paid off in full in October, 1973, nine or ten months prior to the new loan.[5] Deran and his family put up $80,000 of the $150,000. Karnig and Nubar put up $35,000; other investors, $35,000.

---

[4] Deran himself was not inexperienced in mortgage loan transactions, having made such loans of five and six figures on two occasions in the past. In 1973, on a loan not involved in this case, Deran utilized the services of Nubar and Karnig as collection agents for the mortgage payments, for which service they were paid one percent of the payments.

[5] The impact of the stipulation was somewhat attenuated by answers elicited from Nubar by the plaintiffs' counsel. The gist of the answers was that Nubar and Karnig did not make a point of disclosing their other transactions with Begelfer and Iocco to Deran or the other investors but thought

The final transaction which is the subject of this action occurred several months later, on May 30, 1975, when Begelfer and Iocco approached Deran directly for an additional loan of $25,000 on the Trowbridge Street property. Deran agreed. A new note was made out in the amount of $85,000 (replacing, apparently, the earlier note for $60,000), signed by Begelfer and Iocco both individually and as trustees of 45 Trowbridge Realty Trust. The interest rate remained fifteen percent, with one percent going to Karnig and Nubar for their services in collection and disbursement.

The real estate market suffered a downturn in 1975, and by December Begelfer and Iocco began to experience difficulties in meeting their payments on these and other obligations.[6] Deran, Nubar, and Karnig met with Begelfer at the office of the lawyer who had handled the paperwork for Deran. Deran advocated immediate foreclosure. Nubar and Karnig, concerned in part for their other loans outstanding to Begelfer, prevailed in urging an extension of time. Several months later Begelfer remained unable to make payments. The Dinjians agreed with Begelfer that certain properties in arrears, including the Sewall Street property, would be the subject of a peaceable entry, title to be taken in the name of Three-D Realty Trust, with Karnig, Nubar, and Deran being the three trustees. Deran's son became manager of the Sewall Street property (at $200 per month) and another property (at $300 per month), in charge of unit rentals and management until such time as the units could be sold profitably.

Disagreements arose, and in February, 1977, Deran resigned as a trustee, and his son was terminated as rental manager. In early 1978, to forestall a mortgage foreclosure by the first mortgagee, Three-D Realty Trust filed a voluntary petition

that they had probably talked about the other transactions in the course of general family discussions on the subject. These answers may in part underlie the judge's findings that Nubar and Karnig did not engage in any "unfairness or deception," that they did not "fail[ ] to disclose any material or significant fact," and "that they disclosed fully all material aspects of their activities in the transactions which are the subject of this suit."

[6] Some of the difficulties are chronicled in *Begelfer* v. *Najarian*, 381 Mass. 177 (1980).

under chapter 12 of the Bankruptcy Act. Nubar and Karnig, representing the second mortgagees, persuaded the first mortgagee to settle for $400,000 (on a $470,000 indebtedness), and, in exchange for Deran and his family's agreeing to assent to the reorganization plan, Nubar and Karnig bought out their interests (with a principal amount of $80,000) for $20,000.[7]

Meanwhile, the trustees of 45 Trowbridge Realty Trust declared bankruptcy. Begelfer and Iocco found new investors who were willing to buy out the interests of Deran and his family for $55,000. The offer was accepted, resulting in a principal loss of $30,000. Deran and his family brought this action to recoup their losses against Karnig and Nubar.

Deran's principal contention is that Nubar and Karnig failed to register as investment advisers and to make disclosure of their interests in the loan transactions in accordance with the requirements of Federal and Massachusetts securities laws. Deran concedes, however, that Nubar and Karnig are not subject to the requirements of those laws applicable to investment advisers unless the notes from Begelfer and Iocco were "securities" within the meaning of the relevant acts.[8] The Investment Advisers Act of 1940, 15 U.S.C. § 80b-2(18) (1982), the Securities Act of 1933, 15 U.S.C. § 77(b)(1) (Supp. I 1983), the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10) (1982), and G. L. c. 110A, § 401(*k*), all define "security" in a manner that includes "note[s]" and "evidence[s] of indebtedness," but the cases decided under both the Federal and the State laws have made clear that not all notes are securities within those

---

[7] When conditions improved, the residential units were successfully sold off as condominiums, and the investors other than Deran and his family apparently recovered their investments in full.

[8] The Investment Advisers Act defines an investment adviser as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities." 15 U.S.C. § 80b-2(a)(11) (1982).

definitions.[9] *Futura Dev. Corp.* v. *Centex Corp.*, 761 F.2d 33, 39 (1st Cir. 1985), and cases cited. Thus, it has been held that an instrument is not a security unless its issuance "involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *SEC* v. *W. J. Howey Co.*, 328 U.S. 293, 301 (1946). Adopting the tests of that case and *United Housing Foundation, Inc.* v. *Forman*, 421 U.S. 837 (1975),[10] the Supreme Judicial Court has distinguished between "sales of or investments in securities," on the one hand, and "bona fide loans" on the other. *Valley Stream Teachers Fed. Credit Union* v. *Commissioner of Banks*, 376 Mass. 845, 858 (1978).

The judge could properly have concluded, as he did, that the notes involved in this case were simple loan transactions rather than sales of securities. Material factors bearing on such a conclusion include: the size of the offerings (tailor-made instruments are less likely to be considered securities), see *Futura Dev. Corp.* v. *Centex Corp.*, 761 F.2d at 41; the relatively short terms of the notes (each was a one-year note), see *Great Western Bank & Trust* v. *Kotz*, 532 F.2d 1252, 1257 (9th Cir. 1976); the fact that the notes were collateralized (i.e., secured by mortgages), see *id.*, at 1258; and the fact that the return was predetermined rather than being subject to the managerial efforts of the maker, see *United Housing Foundation,*

---

[9] "In providing this definition Congress did not attempt to articulate the relevant economic criteria for distinguishing 'securities' from 'non-securities.' Rather, it sought to define 'the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.' H.R.Rep. No. 85, 73d Cong., 1st Sess., 11 (1933)." *United Housing Foundation, Inc.* v. *Forman*, 421 U.S. 837, 847-848 (1975).

[10] "The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. By profits, the Court has meant either capital appreciation resulting from the development of the initial investment, as in [*SEC* v. *C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943)] (sale of oil leases conditioned on promoters' agreement to drill exploratory well), or a participation in earnings resulting from the use of investors' funds, as in *Tcherepnin* v. *Knight*, [389 U.S. 332 (1967)] (dividends on the investment based on savings and loan association's profits)." *United Housing Foundation, Inc.* v. *Forman*, 421 U.S. at 852.

*Inc.* v. *Forman*, 421 U.S. at 852; *Valley Stream Teachers Fed. Credit Union* v. *Commissioner of Banks*, 376 Mass. at 858; *Futura Dev. Corp.* v. *Centex Corp.*, 761 F.2d at 41.

In distinguishing between commercial notes on the one hand and investments on the other, courts have observed that collateralized, short-term loans repayable at fixed rates of interest are normally considered commercial notes. *National Bank of Commerce* v. *All Amercian Assur. Co.*, 583 F.2d 1295, 1301 (5th Cir. 1978). *Boeck* v. *Logan 480 Dairy Farm*, 606 F. Supp. 868, 871 (S.D. Iowa 1985). "The definition of a security is not likely to include purely private transactions whose terms are negotiated between lender and borrower. *Marine Bank* v. *Weaver*, 455 U.S. 551, 560 & n.10 (1982)." *Underhill* v. *Royal*, 769 F.2d 1426, 1431 (9th Cir. 1985). While second mortgages typically involve greater risk than first mortgages, courts "distinguish between the 'risky loan' and 'risk capital.' *Motel Co.* v. *Commissioner*, 340 F.2d 445, 446 (2d Cir. 1965)." *Great Western Bank & Trust* v. *Kotz*, 532 F.2d at 1257. The judge did not err in concluding that the notes here were simple, commercial loan transactions rather than sales of securities.

The remedies provided by the Commonwealth's fair trade practices act, G. L. c. 93A, as in effect prior to St. 1979, c. 406, § 1, are equally unavailable to the plaintiffs. Conceding implicitly that they are not entitled to sue under § 11 (presumably because they were not engaged in the business of money lending — see *Lantner* v. *Carson*, 374 Mass. 606, 610-612 [1978], and *Begelfer* v. *Najarian*, 381 Mass. 177, 190-191 [1980], both distinguishing between "a business person and an individual who participates in commercial transactions on a private, nonprofessional basis"), the plaintiffs framed their action instead under § 9, which at the time[11] was solely a

---

[11] Section 9 was amended by St. 1979, c. 406, § 1, to eliminate the language next quoted in the text and to widen the remedy to "[a]ny person, other than a person entitled to bring action under [§ 11], who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by [§ 2] or any rule or regulation issued thereunder . . . ." Under this formulation one so injured has standing to

consumer protection remedy. See *Frank J. Linhares Co.* v. *Reliance Ins. Co.*, 4 Mass. App. Ct. 617, 620 (1976). "The § 9 private remedy [was before 1979] available only to a consumer, that is, a 'person who purchases or leases goods or services or property, real or personal, primarily for personal, family or household purposes.'" *Slaney* v. *Westwood Auto, Inc.*, 366 Mass. 688, 701 (1975), quoting from § 9(1) as then in effect. See also *Baldassari* v. *Public Fin. Trust*, 369 Mass. 33, 44 (1975).

Lending money secured by collateral to commercial builders or developers is not a purchase of goods or property primarily for personal, family or household purposes. A commercial transaction is not made a consumer transaction simply because one of the parties is not acting in the course of his trade or occupation. Compare *Mechanics Natl. Bank* v. *Killeen*, 377 Mass. 100, 110-111 nn. 8 & 9 (1979) (expressing doubt that one borrowing money to buy and pledge stocks for his own account was entitled to sue under § 9 before amendment); *Linthicum* v. *Archambault*, 379 Mass. 381, 386-387 (1979) (reshingling of duplex house used for rental purposes is not a consumer transaction); *Murphy* v. *Charlestown Sav. Bank*, 380 Mass. 738, 742-750 (1980) (holding that the borrower in a home mortgage transaction is not a purchaser of property within § 9 before the amendment, and suggesting more broadly that a loan by one not the seller was intended by the Legislature to be governed by G. L. c. 140C rather than G. L. c. 93A, § 9); *Danca* v. *Taunton Sav. Bank*, 385 Mass. 1, 5-7 (1982) (mortgagee not a purchaser under § 9, even as to incidentals such as plot plans).

Under the judge's findings the plaintiffs also encounter serious difficulty in arguing that they were victims of unfair or

sue under either § 9 or § 11. Under the earlier formulation some persons so injured could lack standing because they were neither businessmen acting in a business context nor persons who were purchasing property, goods, or services "primarily for personal, family or household purposes." In any event the plaintiffs have contended neither here (see *Travenol Laboratories, Inc.* v. *Zotal, Ltd.*, 394 Mass. 95, 97 [1985]) nor in the trial court (see *Royal Indem. Co.* v. *Blakely*, 372 Mass. 86, 87-88 [1977]) that they could recover in an action framed under § 11.

deceptive practices. In the first Trowbridge Street loan Nubar and Karnig only supplied the names of the borrowers, this at the request of the plaintiffs. Negotiations were handled solely between the plaintiffs, their attorney, and the borrowers. Nubar and Karnig received no loan origination fee, and their prospective involvement in collecting mortgage interest payments for a commission was understood by all parties (and presumably requested by the plaintiffs). The plaintiffs testified that they sought advice from Karnig and Nubar when Begelfer asked them to lend an additional amount on the Trowbridge Street property; this testimony is not reflected in the findings of the judge, who would have been justified in thinking there was little causal relationship between any such conversations and the plaintiffs' decision to enlarge the size of the note. On the judge's findings the plaintiffs' eagerness was not the result of solicitation by Nubar or Karnig.

The picture is not substantially different in respect of the Sewall Avenue loan. The stipulation that Nubar and Karnig did not explain to their co-lenders that they would receive a loan origination fee (see note 5, *supra*) is of dubious weight where the lenders already understood that Karnig and Nubar had a financial interest in the loan, both as principals and as loan managers for a commission. The other fact of which the plaintiffs were not specifically advised — that Begelfer and Iocco had previously paid off a loan from Nubar and Karnig on the Sewall Avenue property — could properly be treated as a historical fact of little relevance to the plaintiffs' participation in the new loan; and the acknowledged fact that Nubar and Karnig had other loan involvements with Begelfer and Iocco, either personally or for servicing or both (compare *Danca* v. *Taunton Sav. Bank*, 385 Mass. at 6), must be treated as governed by the judge's finding that Nubar and Karnig "disclosed fully all material aspects of their activities in the transactions which are the subject of this suit." On the evidence the judge could properly conclude, as he clearly did, that the plaintiffs had failed to make out a factual case of unfairness or deception.

*Judgment affirmed.*