Toribio GARCIA, Plaintiff,

v.

Hon. Juan BAUZA SALAS, et al., Defendants.

Civ. No. 87–0662 (PG).

United States District Court, D. Puerto Rico.

May 23, 1988.

As Amended June 8, 1988.

José Muñoz Silva, Mayaguez, P.R., for plaintiff.

María Jiménez, Dept. of Justice, Com. of Puerto Rico, San Juan, P.R., for defendants.

## OPINION AND ORDER

PEREZ–GIMENEZ, Chief Judge.

Toribio García asks us for a preliminary injunction to stop Hon. Juan Bauzá Salas, Secretary of Agriculture of the Commonwealth of Puerto Rico ("the Secretary"), from enforcing a regulation that allegedly violates his rights under the Interstate Commerce Clause of the United States Constitution, U.S. Constitution, U.S.C. Art. I, § 8, cl. 3. Before going into the merits of

the injunction, a factual and procedural background is necessary to rule on a *res judicata* defense raised by defendants.

García was engaged in the business of repacking refined sugar. He used to import the sugar in one-hundred pound bags from the United States and foreign countries, repack it in two and five-pound bags, and sell those to food stores serving individual consumers. On August 20, 1984, an amendment to Section 6 of the Secretary's Market Regulation # 13, which governs the sugar marketing in the Island, was made law. The new section 6 language expressly prohibited García's import-to-repack business. Prior to the amendment, Regulation 13 was silent as to García's line of business.

On October 9, 1984, García sued the Commonwealth of Puerto Rico and the Secretary in the Mayaguez Superior Court to enjoin them from enforcing Regulation 13 because it allegedly violated his rights under the Puerto Rico Constitution's Due Process and Equal Protection clauses.[1] P.R. Const., Art. II, § 7. No federal constitutional claims were raised.

While the Mayaguez's court decision was pending, the Sugar Corporation of Puerto Rico ("the Sugar Corporation"), an affiliate of the Secretary's department, and its suppliers sued García on August 23, 1985, in the Ponce Superior Court. Several causes of action were presented. On two of them the Sugar Corporation sought to enjoin García from using two and five-pound bags similar to those used by the corporation, their use allegedly constituting an unfair business practice and a violation of the corporation's trademark rights. In a third cause of action, the Sugar Corporation alleged that, according to Regulation 13, García needed a license issued by the Secretary to be able to engage in the repacking business. No counterclaims based on federal law were raised.

On September 26, 1985, the Mayaguez court held for García. It concluded that the 1984 amendments to Regulation 13 were not applicable to him because these would deprive him of his property without due process of law. This decision was appealed by the Commonwealth and the Secretary to the Supreme Court of Puerto Rico (RE 85–496).

On November 29, 1985, the Ponce court decided against García. It ordered him to recall all sugar packed in the bags he had been using. Furthermore, García was ordered to stop repacking refined imported sugar because such activity was illegal under Regulation 13.[2] This decision was appealed by García to the Puerto Rico Supreme Court (CE 85–841). The Court consolidated the two appeals.

While these were pending, plaintiff sued the Secretary in this Court on May 22, 1987. He brought five causes of action. He claimed violations of his rights under Due Process, Equal Protection and Interstate Commerce clauses of the United States Constitution, U.S. Const. U.S.C., Amend. 14; Art. I, § 8; as well as under the Sherman Act, 15 U.S.C. § 1. García also sued based on Puerto Rico's negligence law. 31 L.P.R.A. § 5141.

In our Opinion and Order of October 23, 1987, we stayed these proceedings pending the Puerto Rico Supreme court's decision on the two local appeals. We based our stay on the *Colorado River* doctrine.

On November 30, 1987, the Supreme Court announced its decision. It upheld the constitutionality of Regulation 13. The due process and equal protection claims founded on the Puerto Rican Constitution were deemed meritless.

García came back to this Court for relief. In our Opinion and Order of January 28, 1988, we dismissed García's claims of alleged violations of the Due Process and Equal Protection clauses of the United States Constitution. Claims based on the Interstate Commerce clause, the Sherman

---

1. We are basing the findings of what happened in the local courts on the Puerto Rico Supreme Court decision of plaintiff's local suits and plaintiff's allegations in his injunction petition.

2. We are baffled as to why the Ponce court did not refrain from deciding on the application of Regulation 13 to García when the Mayaguez court had already ruled that it did not apply.

Act and the local negligence law remained pending.

A hearing was held on February 19, 1988, to discuss whether a preliminary injunction should be granted based on the Interstate Commerce clause claim. On March 23, 1988, we ordered plaintiff to show cause as to why the antitrust and negligence claims should not be dismissed given that these had not been pursued since the complaint was filed. Plaintiff asked us to dismiss the former without prejudice and the latter with prejudice. We so ordered.

The only pending claim is thus the one grounded on the Interstate Commerce clause. The Secretary alleges that Garcia should have raised it in the local lower courts. In the alternative, the Secretary claims plaintiff should have notified local courts that he was reserving the claim for our resolution. *England v. Louisiana State Board of Medical Examiners,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). By failing to follow either procedure, the Secretary believes Garcia is barred from bringing the claim here in light of *res judicata* principles.

In order to rule on such defense, we must look at Puerto Rican law.

The preclusive effect of a state court judgment in a subsequent federal law suit generally is determined by the full faith and credit statute, which provides that state judicial proceedings "shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such state ... from which they are taken." 28 U.S.C. § 1738; *Marrese v. American Academy of Ortho. Surgeons,* 470 U.S. 373, 380, [105 S.Ct. 1327, 1331, 84 L.Ed.2d 274] (1984).

Puerto Rico's *res judicata* law is codified in P.R. Laws Ann. tit. 31, § 3343:

In order that the presumption of the *res judicata* may be valid in another suit, it is necessary that, between the case decided by the sentence and that in which the same is invoked, there be the most perfect indentity between things, causes, persons of the litigants, and their capacity as such.

■ Thus, in order for the *res judicata* defense to be effective, there must be identity between "things", "causes" and parties. *Lausell Marxuach v. Díaz de Yañez,* 103 D.P.R. 533, 535 (1975). *Futura Development Corp. v. Centex Corp.,* 761 F.2d 33, 42 (1st Cir.1985). If these three conditions are met, a judgment rendered constitutes an impediment in a subsequent action as to claims that were or could have been litigated in the former action. *Id. citing Capó Sánchez v. Secretary of Treas.,* 91 P.R.R. 817, 819 (1965).

These three identities are present here. The "thing" and "cause" at issue here are the same as the ones that were in controversy at the two local courts—Regulation 13 and its prohibition of plaintiff's import-to-repack business. The parties here are also the same as the ones in the proceedings at the Mayaguez Superior Court and the Puerto Rico Supreme Court.

■ However, the commerce clause claim before us was not litigated in the local forae. And we believe it could not have been adjudicated there because, under Puerto Rican law, as exposed by the Puerto Rico Supreme Court, the clause is inapplicable to the Island. Thus, the *res judicata* defense has no merit. We explain.

The Puerto Rico Supreme Court has dealt directly with the applicability of the Interstate Commerce clause on three occasions. *RCA v. Govt. of The Capital,* 91 P.R.R. 404 (1964); *South P.R. Sugar Corporation v. Public Service Comm.,* 93 P.R. R. 11 (1966); *Marketing and Brokerage Specialists, Inc. v. Secretary of Agriculture,* 87 J.T.S. 12 (1987).[3] In *RCA,* the

---

**3.** Three other Puerto Rico Supreme Court cases, *International Harvester Co. v. Srio. de Hacienda,* 114 D.P.R. 281 (1983); *Gómez Hnos., Inc. v. Srio. de Hacienda,* 114 D.P.R. 367 (1983); *Columbia Pictures Ind., Inc. v. Srio. de Hacienda,* 114 D.P.R. 749 (1983), dealt tangentially with the Interstate Commerce clause. In these cases, Puerto Rican taxes were challenged on due process grounds only. The Court did not have to rule on challenges based on the Interstate Commerce clause.

court ruled on the legality of a license levied by the Municipality of San Juan. The tax was challenged because it allegedly interfered unduly with commerce between Puerto Rico and the United States as that trade should flow in light of the Interstate Commerce clause. The court held:

> *[It is a] historical fact that the constitutional provision which reserves to Congress the power to regulate commerce with foreign nations, between the states and with Indian tribes,* [the Interstate Commerce clause] *has only not governed, nor governs by its own force in Puerto Rico,* but, on the contrary, Congress Expressly provided that neither the Interstate Commerce Act ... nor an Act to regulate commerce of February 4, 1907, and the Act amendatory thereof according to § 38 of the Organic Act of 1917, 39 Stat. 964, and which are still in force as part of the Federal Relations Act, shall apply to Puerto Rico.

*RCA*, 91 P.R.R. at 418 (emphasis supplied).

And, based on that "fact" the Court said:

> Th[e] interstate commerce relation [between Puerto Rico and the United States] has constitutionally had, and still has, contours which are different from the relation which under the Constitution prevails among the states of the Union. That is why even under the former systems Puerto Rico was able to exercise the taxing power, and the Commonwealth may exercise that power at present expecting interstate commerce *in a manner that perhaps it would not be permissible to a state covered by the provisions of the Federal Constitution.*

*Id.* at 419 (emphasis supplied).

The Court's implication in the latter phrase is clear: the Interstate Commerce clause of the United States Constitution does not apply to Puerto Rico. With that in mind, the Court held:

> Knowing the nature of the tax in litigation, we must say that *even [if] the Commonwealth's taxing power and the taxes in litigation were in the constitutional orbit of the States themselves respecting interstate commerce—and we see that such power is not thus lim-*

*ited—*still the validity of plaintiff's contention to the effect that the imposition and collection of these license taxes interferes with the regulation of interstate commerce and operates as an obstacle, would be quite precarious in the light of known cases of the Supreme Court of the United States which we need not discuss here at length in view of the affirmance in *General Motors Corp.* [377 U.S. 436, 84 S.Ct. 1564, 12 L.Ed.2d 430 (1964)]....

*Id.* at 420 (emphasis supplied).

And, if that was not clear enough, the Court finally held:

> *Assuming that the Commonwealth is in the same constitutional position as the States of the Union respecting interstate commerce,* it seems to us that there is sufficient basis, in the light of the [*General Motors*] decision and of other decision of the Supreme Court, to uphold the validity of the tax challenged herein.

*Id.* at 423 (emphasis supplied).

There is one *ratio decidendi* to be drawn from these pronouncements. According to the Puerto Rico Supreme Court, the Interstate Commerce clause, in its "dormant" state, does not apply to Puerto Rico. The court looked at federal case law only for illustration purposes—to demonstrate that even if federal interstate commerce doctrine would govern, the challenged tax would be constitutional.

Nine months after *RCA*, the Supreme Court of Puerto Rico chose to follow its commerce clause holding in *South P.R. Sugar*. The South P.R. Sugar Corporation challenged Puerto Rico Public Service Commission's decision to fix rates for services rendered by the corporation in receiving, weighing, analyzing, storing, handling, and shipping bulk sugar. Among other things, the corporation claimed that "the process of shipment of freight in ships is comprised within the term of public carriers engaged in maritime transportation and, as such, it constitutes interstate commerce which cannot be regulated by the Commonwealth of Puerto Rico." *South P.R. Sugar*, 93 P.R. R. at 14.

The Supreme Court disposed of the issue by quoting the first two excerpts we referred to, *supra*, p. 968, italicizing the phrase stating that the Interstate Commerce clause "has not ... governed, nor governs, by its own force in Puerto Rico." *Id.* at 15. Then the court said:

> [E]ven assuming that the interstate commerce clause were applicable here as it is to the federal states, petitioners have not shown that the action of an agency of the Commonwealth constitutes an unreasonable, discriminatory, or onerous burden upon interstate commerce, or in conflict with the federal interest. *General Motors Corp. v. Washington*, 377 U.S. 436 [84 S.Ct. 1564, 12 L.Ed.2d 430] (1964); *Cities Services Co. v. Peerless Co.*, 340 U.S. 179, [71 S.Ct. 215, 95 L.Ed. 190] (1950).

*Id.* at 16 (emphasis supplied).

Again, the Supreme Court's holding is undisputable: the Interstate Commerce clause is not applicable to Puerto Rico. The Court refers to the principles derived from the clause and embodied in federal case law only for demonstration purposes.

The Supreme Court had another chance to rule on the applicability of the commerce clause a little more than a year ago in *Marketing*. In that case a milk importer-distributor challenged the Milk Industry Regulating Office's "Regulation No. 2" that specified the type of containers in which the milk it imported could be sold, the areas within the foodstores in which the milk could be put for sale and the need to have a license to import milk. Among other allegations, the milk importer-distributor claimed that Regulation No. 2 violated the Interstate Commerce clause.

This time the Supreme Court ducked the issue:

> It is unnecessary in this case to determine whether the interstate commerce clause of the federal Constitution, art I, sec. 8, in its dormant state, applies to Puerto Rico.[4] *Cf. [RCA; South P.R. Sugar; International Harvester;*

*Gómez Hnos.; Columbia Pictures]* (our translation).

*Marketing*, 87 J.T.S. at 4724.

Then, the Court did it again:

> Notwithstanding, *even if we applied federal caselaw on the commerce clause,* the regulation in controversy is valid.

*Id.* (emphasis supplied).

In light of *Marketing*, the *RCA* and *South P.R. Sugar* holdings still survive: Puerto Rico law takes as a "historical fact" that the Interstate Commerce clause does not govern the trade between Puerto Rico and the United States.

In light of that "fact", the sentences entered by the local courts cannot preclude García from bringing the Interstate Commerce clause claim to this Court. He would not have had a remedy under the clause in the local courts. Raising the claim would have been an act of futility because its principles are not recognized there.

Even if we were to assume *arguendo* that the commerce clause claim could have been raised in the local courts, and thus that the *res judicata* doctrine would mandate its dismissal, we would make an exception to the doctrine. We are aware of the United States Supreme Court's strict application of the *res judicata* doctrine in recent cases. *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981). *See also* Wright, Miller & Cooper, *Federal Practice and Procedure:* Jurisdiction § 4415. However, the door has not been completely shut. Supreme Court cases ruling on the *res judicata* effect of state court judgments in a later section 1983 federal civil action leave some, albeit little, room for maneuver. *Haring v. Prosise*, 462 U.S. 306, 103 S.Ct. 2368, 76 L.Ed.2d 595 (1983); *Migra v. Warren City School Dist. Bd. of Ed.*, 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1983). These section 1983 cases are specially illuminating because García's claim is like a section 1983 claim—a violation of his federal constitutional rights under the commerce clause by a state govern-

---

**4.** We wonder—should not the clause's applicability be taken as given by local courts for a victim of a commerce clause violation to know whether to seek remedy there?

ment official (the Secretary) under the color of state law, Regulation 13.

For example, in *Prosise*, a unanimous Supreme Court talked about "exceptions to collateral estoppel ... in § 1983 actions in light of the understanding of § 1983 that the federal courts could step in where the state courts were unable or unwilling to protect federal rights." 462 U.S. at 313–314, 103 S.Ct. at 2373. The court cited *Allen v. McCurry*, 449 U.S. 90, 101, 101 S.Ct. 411, 418, 66 L.Ed.2d 308 (1980), in support of that pronouncement. The *Allen* language on which the *Prosise* court relied supports our exception to *res judicata* principles in this case:

> In reviewing the legislative history of § 1983 in *Monroe v. Pape* [365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)] the Court inferred that Congress had intended a federal remedy in three circumstances: where state substantive law was facially unconstitutional, where state procedural law was inadequate to allow full litigation of a constitutional claim, and where state procedural law, though adequate in theory, was inadequate in practice. 365 U.S. at 173–174 [81 S.Ct. at 476–477]. *In short, the federal courts could step in when the state courts were unable or unwilling to protect federal rights. Id.* at 176 [81 S.Ct. at 478]. *This understanding of § 1983 might well support an exception to res judicata and collateral estoppel* where state law did not provide fair procedures for the litigation of constitutional claims, *or where a state court failed to even acknowledge the existence of a constitutional principle on which a litigant based his claim.*

*Allen*, 449 U.S. at 100–101, 101 S.Ct. at 418 (emphasis supplied).

The latter phrase describes our situation—the Puerto Rico Supreme Court has expressly held that the Interstate Commerce clause is not applicable to the Island. If the Puerto Rico Supreme Court would have proved to be a "guardian of the federal constitution", *Lovely v. Laliberte*, 498 F.2d 1261, 1263 (1st Cir.1974), with respect to the commerce clause, as it has as to the rest of the U.S. Constitution, we would have recognized the fully preclusive effect of its sentence. But in light of *RCA* and *South P.R. Sugar*, we must intervene to guarantee García's federal constitutional right.

In *Migra*, the U.S. Supreme Court again seems to leave some room for an exception to *res judicata* doctrine in a case like ours. After getting a favorable judgment on a contract dispute in state court, a discharged school district supervisor sued in federal court under section 1983 on actions arising from the same nucleus of operative facts found by the state court. The Court held that the *res judicata* force of the state judgment would have to be measured by state law and remanded to the district court for such determination. Notwithstanding, the court implied that if the school supervisor would have claimed "that the state court would not have adjudicated her federal claims had she presented them in her original suit in the state court", an exception to the state claim preclusion rules could have been considered. *Migra*, 465 U.S. at 84, 104 S.Ct. at 898.

That hypothetical situation is similar to what we face here. Although in our record García has not stated that the Puerto Rican courts would not have ruled on his commerce clause claim, his actions spoke for him. Knowing the non-applicability of the clause under Puerto Rico law, he came here for relief.

An analogy with claims over which this Court has exclusive jurisdiction illustrates the practical effects of our holding. If García would not have voluntarily dismissed his federal antitrust claim, which Congress has provided to be exclusively under our jurisdiction, the local courts' sentences would not have precluded him to pursue it here. *Marrese v. American Academy of Ortho. Surgeons*, 470 U.S. 373, 386, 105 S.Ct. 1327, 1335, 84 L.Ed.2d 274 (1984). The same rationale could be applied for us to retain García's commerce clause claim—the Puerto Rico Supreme Court has *de facto* pushed such claims under our exclusive jurisdiction given its hold-

ing that the clause is inapplicable to Puerto Rico.

The analogy also serves to prove the *sui generis* nature of the *res judicata* exception we are making. No highest court of any of the States of the Union would hold that a provision of the United States constitution or a federal law does not apply to its state. On the other hand, given the peculiar relation between the United States and Puerto Rico, such restraint is not to be assumed from the Island's courts, as evinced by the controversy at hand.[5] The *res judicata* exception would be circumscribed to Puerto Rico and similarly situated territories where the applicability of the U.S. Constitution and the federal laws is not precisely defined.

Some may argue that, although under Puerto Rican law the Interstate Commerce clause is not applicable to Puerto Rico, García should have pursued his claim through the local judicial system and then appeal to the United States Supreme Court. Equity considerations refrain us from believing that such should have been García's mode of proceeding. We must not forget he is asking for a preliminary injunction. Such procedure is tailored to achieve an expedited resolution of a legal dispute. Is García supposed to go through the motions in the Puerto Rican courts, which actually took him more than three years, and then hope for the U.S. Supreme Court to entertain his appeal? What is he supposed to do to earn a living income while he waits?

In light of all said, we cannot give the local courts' sentences a preclusive effect that would prevent García from having his commerce clause claim entertained by this Court. Given the clause's inapplicability to Puerto Rico according to local law, we could have not pretended García to have raised the claim in local courts. How can we now stop him from bringing it here? We are forced to make an exception to what Puerto Rican *res judicata* principles mandate.[5a]

Given our rejection of the *res judicata* defense, we may proceed to rule on the merits of the preliminary injunction. We must grant if if four conditions are met:

The Court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the grant of the injunction.

*Planned Parenthood League of Mass. v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981).

■ García has clearly showed that he will suffer irreparable harm—a violation of his constitutional rights under the Interstate Commerce clause. To this we may add the monetary injury due to lost business. "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." Wright & Miller, *Federal Practice and Procedure:* Civil § 2948, Vol. 11, p. 440.

As to the weighing of probable injuries, the balance tips in favor of García. By enforcing Regulation 13, defendants are barring García from repacking sugar and, thus, denying him the right to earn a living

---

**5.** The extension of the U.S. Constitution and federal laws to Puerto Rico has been subject of much debate. *See Presentation on the Applicability of the United States Constitution and Federal Laws to the Commonwealth of Puerto Rico,* 110 F.R.D. 449 (1985).

**5a.** In *Francisco Ramos González, et al v. Francisca Félix Medina, et al,* 88 JTS 61 (May 13, 1988), the Puerto Rico Supreme Court held that a dismissal by this Court for lack of prosecution is an adjudication upon the merits in light of Fed. R.Civ.P. 41(b). Notwithstanding, the Court reversed a lower court decision that dismissed on *res judicata* grounds an action brought by plain-

tiffs whose federal claims had been dismissed for lack of prosecution by this Court. The Supreme Court made an exception to applicable federal *res judicata* principles. It cited local case law in support of the exception and, thus, we believe it is safe to assume the Court would have made the same exception if local *res judicata* doctrine had to be applied.

For purposes of the case at hand, this shows that local *res judicata* principles will yield to overpowering considerations of fairness and public policy like the ones on which we base our exception.

income. We can think of no comparable harm to defendants if the injunction is granted.

The public interest factor also makes us lean to García's favor. The only policy consideration discussed during the injunction hearing, and the one on which Regulation 13 is allegedly based,[6] is the wholesomeness of the sugar sold by García. The Secretary claims that in the process of repacking, the sugar might become spoiled. However, this allegation is a mere speculation. During the years prior to the 1984 amendment to Regulation 13, when plaintiff lawfully engaged in the repacking business, there were no complaints, that we know of, as to the quality of García's sugar.

Finally, we also believe García has a strong case on the merits. He has more than a substantial likelihood of success. *Tremblay v. Marsh,* 750 F.2d 3, 7 (1st Cir.1984).

■ Unlike the Puerto Rico Supreme Court, we have held that the Interstate Commerce clause, in its dormant state, fully governs the trade relations between Puerto Rico and the United States. *Sea-Land Services, Inc. v. Municipality of San Juan,* 505 F.Supp. 533 (D.P.R.1980). We need not discuss the rationale for such holding. It suffices to say that nothing has happened since *Sea-Land* that would make us reconsider it.

Given the clause's applicability, we must construe it in light of the comprehensive body of U.S. Supreme Court case law demarcating its strictures.

> The basic rule is that if the statutory purpose or effect is to isolate state producers from competitive interstate commerce commodities, thereby augmenting the economic security of the local market, the parochial legislation is invalid. State restraint of the national market, even under the guise of local health and safety pursuits, is also untenable if a less burdensome, nondiscriminatory alternative is available.

> Rotunda, Nowak & Young, *Treatise on Constitutional Law—Substance and Procedure,* § 11.8, Vol. 1, p. 601.

This "basic rule" summarizes the reasons why we believe Regulation 13 is unconstitutional.

The regulation purports to govern the marketing of sugar in Puerto Rico. It is promulgated by the Secretary in accordance with the powers vested in him by the Legislature of Puerto Rico. Act No. 241 of May 8, 1950, as amended, 5 L.P.R.A. §§ 121–126. Among other things, the Secretary has restricted the mode of importing sugar to the Island.

> Section 6—Containers.

> A. Refined sugar to be imported in Puerto Rico shall come in consumer-size packages inside the corresponding shipping containers. For the purposes of this Regulation a consumer size package is that one whose net content does not exceed five (5) pounds.

> B. The raw sugar, refined sugar for industrial use or sweepings that are imported to be merchandized and/or elaborated in Puerto Rico, shall come packed in containers with a capacity up to two hundred (200) pounds only. <u>The refined sugar imported for industrial use cannot be repacked in containers for direct sales to the consumers.</u>

Regulation 13 (emphasis supplied).

As we have said, *supra,* pp. 965–66, this section was amended in August 1984 to add the underlined sentence in subsection B. In plain words, the regulation forbids the importation of refined sugar in large containers if it is to be repacked in small packages, usually two and five-pound bags, for sale to individual consumers. It does permit the importation of refined sugar only if in consumer-sized bags of less than five pounds.

The net effect of the amended section 6 is alarming. If we look at the statistics on the market for two and five-pound bags of refined sugar, *i.e.,* the individual consumer or refined table sugar market, not a grain

---

6. *See, infra,* pp. 973–74.

of imported sugar has made it to that market in the past two fiscal years.[7]

| Fiscal Year | Imported | Produced In P.R. |
|---|---|---|
| 1984–85 | 15,156,960 lbs. | 121,985,200 lbs. |
| 1985–86 | 0 | 89,265,200 lbs. |
| 1986–87 | 0 | 99,854,400 lbs. |

We also infer that the sugar imported for this market in the 1984–85 fiscal year occurred prior to Regulation 13's amendment.

■ Such market composition is the result of a well-planned governmental scheme to keep a public corporation, the Sugar Corporation, in business. An explanation ensues.

Before the 1984 amendment to Regulation 13, there were two ways to import sugar for the individual consumer market: (1) to bring it in small bags ready for sale or, as plaintiff used to do, (2) bring it in large containers and repack it locally in the small bags. The only other supplier for that market is the Sugar Corporation of Puerto Rico, which grows and refines all the Puerto Rican sugar. This government-owned company is the only entity engaged in the Island's sugar business. Private corporations completely abandoned this industry more than thirteen years ago.[8]

With the 1984 amendment, the repacking option was outlawed. In theory, sugar for the refined table market could still be imported in the two or five-pound bags. But in reality, as the statistics show, the only supplier for that market has been the Sugar Corporation, most probably because the importation of the consumer-size bags is an unprofitable venture. The Sugar Corporation has thus achieved a monopolistic position in the refined table sugar market by eliminating the only economically viable competition: the importer/repacker.

Regulation 13 is the type of parochial legislation the Interstate Commerce clause has been construed to prohibit. As part of an economic unit with States of the Union, Puerto Rico must not erect such barriers to trade. The Secretary may not pre-empt the refined table sugar market for the local producer to the exclusion of production from other areas of the United States. *Po-lar Co. v. Andrews*, 375 U.S. 361, 377, 84 S.Ct. 378, 387, 11 L.Ed.2d 389 (1963).

Regulation 13 is close to being blatant economic protectionism. *Philadephia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978). Its discriminatory effect and purpose, as we have discussed, are beyond dispute. *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471 n. 15, 101 S.Ct. 715, 727 n. 15, 66 L.Ed.2d 659 (1981). We could rule that the regulation is *per se* invalid without further inquiring into its purported purpose. We will nevertheless examine it in light of the applicable case law.

In the injunction hearing, the Secretary, through his counsel, stated that the repacking had to be prohibited because the wholesomeness of the sugar could be jeopardized—transferring the sugar from the large containers in which they are imported to the small bags for individual consumption could present health risks. We believe the Secretary's preoccupation is legitimate. But there clearly are more reasonable, non-discriminatory alternatives to protect the consumers that are not as burdensome to the commerce between Puerto Rico and the United States. Puerto Rico, like a state, may legislate in areas of legitimate local concern; nonetheless, this power is limited by the Interstate Commerce clause.

In a case like ours, where the discrimination against interstate commerce is demonstrated, "the burden falls on the State to justify it both in terms of the local benefits flowing from the statute and the unavailability of non-discriminatory alternatives adequate to preserve the local interests at stake." *Hunt v. Washington Apple Advertising Comm'n.*, 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977), *citing Dean Milk Co. v. Madison*, 340 U.S. 349, 354, 71 S.Ct. 295, 298, 95 L.Ed. 329 (1951).

The Secretary has failed to convince us that there are not less burdensome measures that can be implemented in pursuit of the "wholesomeness" concern embodied in

---

7. Figures provided by defendant in compliance with our February 22, 1988, order.

8. *See The Caribbean Business,* Thursday, April 21, 1988, Appendix I.

the repacking prohibition. Why can the same precautions taken by the Sugar Corporation in its packing process not be implemented in repacking factories such as plaintiff's? We assume there must be health inspections at the corporation's packing sites or the sugar packing machines must meet some health standards. Whatever quality controls are required from the corporation packers may also be required from repackers such as García. Enforcement of the standards will involve some costs—but that option is much less onerous on interstate commerce than the outright prohibition on the importation of refined sugar for individual consumption.

At the heart of this case is the Secretary's desire to protect the decimated Puerto Rican sugar industry. Much is at stake —13,400 jobs and more than 53,000 acres of land with no other use but cane growing.[9] The political price of not keeping the industry alive is obviously high. The Secretary, through Regulation 13, has thus cornered part of the sugar market—the refined table sugar submarket—to place all the sugar locally grown and keep the industry going. However, such end cannot be achieved by the implementation of an unconstitutional regulation.

We cannot object on legal grounds to the heavy subsidizing of the sugar industry by the Government of Puerto Rico. The Legislature allocates those funds and it represents the will of the people under our democratic government. Inner political checks assure that the Puerto Rican people, who directly pay for the subsidy, can weigh the costs and benefits through those that represent them in the Legislature. *Rotunda's Treatise*, § 11.8, Vol. I, pp. 602–603.

But such "inner political check" is not at work in the promulgation of Regulation 13. Puerto Ricans are being deprived of imported refined table sugar that could very well be cheaper. Thus, on top of the heavy direct subsidy paid from the public funds, consumers could also be paying a higher price for sugar. And this hidden extra cost would be imposed on them without their consent as manifested by the Legislature.

A broader scope for judicial review should exist in these instances of legislative judgment based on hidden costs than exist when the costs of the legislative decision is obvious. A court decision that requires a legislative body to reveal the true expense of a legislative decision does not infringe on the majority's substantive right to give aid to [the Sugar Corporation]. Such a mandate only encourages an open decision-making process: a process that facilitates more rational legislative decision.

Rotunda, *The Commercial Speech Doctrine in the Supreme Court*, 1976, Vol. III L. Forum 1080, 1083.

Our intervention was imperative in this case.

WHEREFORE, for the reasons stated, we hereby GRANT plaintiff's preliminary injunction petition.

IT IS SO ORDERED.

## APPENDIX

### CARIBBEAN BUSINESS

**Thursday, April 21, 1988**

**Subsidizing sugar industry**

**heavy drain on P.R. taxpayers**

By AURA N. ALFARO

CARIBBEAN BUSINESS Reporter

Sugar may not be dead yet, but keeping it alive is killing the taxpayers.

Fifteen years after private industry abandoned sugar production in Puerto Rico because it was no longer profitable, and the Commonwealth took over, subsidizing this industry continues to be one of government's costliest programs.

Last year alone, the government poured out about $30 million in taxpayers' money to keep sugar production alive, farm land in use and sugar industry workers employed.

The Puerto Rico Sugar Corporation reported its 13th consecutive loss in 1987, and

---

9. See note 8.

continues to limp along supported by the government, which has paid out $557 million just to cover the losses.

Government officials agree that closing the five existing sugar mills and one refinery would save taxpayers millions of dollars—but concede that they have no idea of how the industry's 13,400 workers will find other jobs. A fourth of them work for the Sugar Corporation—a public corporation affiliated with the Commonwealth Department of Agriculture.

In 1987, the industry generated total sales of $71.1 million and paid nearly $17 million in table sugar excise taxes, property taxes and light, water and phone bills. Nevertheless, the Legislature last year assigned the agency $109.1 million to cover principal and interest payments on its $413.0 accumulated debt, and an estimated cash deficit of $19 million. Add to that about $9 million in subsidies and incentives. The industry ultimately had a cash deficit of $24 million, meaning again it swallowed up about $30 million in taxpayers' money to continue operating.

### No other use for land

Arsenio Martinez, executive director of the Sugar Corporation, told CARIBBEAN BUSINESS that Puerto Rico continues to support this ailing industry because it can propose no other use for the 54,700 *cuerdas* (53,000 acres) now planted in sugarcane.

The agency's primary function, according to its own statement of purpose, is to "conserve, develop, improve and intensify land cultivation and to operate mills dedicated to the production and processing of raw sugar, refined sugar and molasses to the extent that it is economically acceptable."

### Half a billion in debt

But what does government consider economically acceptable? The corporation's debt peaked at $499 million in 1982. This year it's $378 million. Corporation officials insist that if everything goes as planned, the Sugar Corporation should be able to pay off its debts by 1994. But a hurricane or a drought could upset these projections.

If things continue as they are, taxpayers can be expected to swallow more and bitter losses. This year, the Sugar Corporation is requesting a total legislative assignment of $107.6 million: $78.6 million to cover principal and interest payment on debts, plus $23.4 million to cover the agency's projected cash deficit. For the second year in a row, the Sugar Corporation has again had to ask the Legislature to provide it with $5 million more to cover the previous year's actual cash deficit.

"If I were the owner of these sugar mills, I would have sold them all," said Duhamel Zayas, the agency's assistant executive director. "However, the government has other problems to deal with, such as maintaining employment and keeping the farm land in use."

### Near-poverty work force

The bulk of the island's 13,400 sugar workers earn minimum wage. About 25% are employees of the Sugar Corporation, which had a payroll of $25.2 million last year. Sugarcane farmers employ most of the industry's cane cutters, field hands and truckers.

Less than half of the Sugar Corporation employees—those in administrative jobs and some doing maintenance and repairs at the mills—work year-round. The remainder only working during the *zafra,* or harvesting and milling season, which lasts an average of 105 days, usually from January through mid-April.

That means the Commonwealth, for last year alone, shelled out an average of $30 million to keep about 1,500 Sugar Corporation employees working full time, some 899 farmers in business and another 7,676 workers earning minimum wage for a mere 105 days.

During the rest of the year agricultural workers live off unemployment benefits, food assistance and odd jobs. Some travel to Louisiana and Florida to work in the sugarcane harvest, which ends just prior to the start of Puerto Rico's.

### Signs of privatization

Most of the land used to grow sugarcane is government-owned and managed by the

Puerto Rico Land Authority. The Sugar Corporation did the farming until 1983, when a government study revealed that land in private hands yielded better returns. Since then, the Commonwealth leases all its sugarcane land to farmers.

According to industry insiders, on many occasions the land has not been leased to individuals based on their probabilities for success as farmers or their experience, but to former long-time mill employees or political cronies.

"I almost didn't get it because I wasn't a member of the right party at the time," said Eric Torres Calcerrada, an agronomist who's been farming some 469 acres in Ponce since 1982.

Francisco Carreras Esteban, who has a bachelor's degree in business administration, is another Ponce sugarcane farmer, who cultivates some 435 acres, also since 1982.

"The most frustrating thing about sugarcane farming is you strive to get your farm to produce at the most efficient level possible and then you hand your crop to the mill, and get paid based on whatever it turns out," Carreras Esteban said. "Farmers pay the consequences if the mill is inefficient, and the efficient farmers pay the consequences for the inefficient. It's very frustrating."

Commonwealth Agriculture Secretary Juan A. Bauza recently conceded that the closing of mills in the past and bringing production down to scarcely 100,000 tons of raw sugar—enough to cover the yearly local demand for refined table sugar—has not reduced losses. The industry has been producing about that much since 1983, and continues to have yearly cash deficits of at least $24 million.

"The world market price has not improved as anticipated," Bauza said. "Europe continues to subsidize beet sugar, and corn cultivation continues high, meaning corn syrup production is also high. In addition, people have become very health and diet conscious and there is stiff competition from artificial sweeteners.

"Personally, I believe the industry needs a series of readjustments and measures to update it," Bauza added. He disclosed he has Price Waterhouse & Co., one of the nation's "Big Eight" accounting firms, studying the Sugar Corporation's situation.

Fifteen years after government's initial fiasco, the Sugar Corporation's debt has quadrupled and only five 40–year-old-plus mills and one refinery are operating, at one-third of their capacity.

Private enterprise knew what was coming. Government could not see the handwriting on the wall, and Puerto Rico's taxpayers are paying the price.

## EDITORIAL

### CARIBBEAN BUSINESS, APRIL 21, 1988

#### Billion-dollar drain

The Commonwealth's effort to maintain jobs in the sugar industry cost the taxpayers $30 million in 1987.

Thirteen years of the Puerto Rico Sugar Corporation losing money represents a $557 million drain on Puerto Rico's Treasury just to cover losses, plus another $500 million drain to service the corporation debt.

How many $1 billion government programs can we as taxpayers afford?

The Commonwealth should by now have been able to do something creative and intelligent to solve this problem. Hiring Price Waterhouse & Co. is a good first step to determine the available options. One thing we can say is that whatever path the Secretary of Agriculture takes, it will be a tough one. It will take a lot of guts and a consensus among Commonwealth leaders that fast action must be taken.

Some solution must be found. We just can't keep on going for another 13 years losing $30 million a year.

The money should be used to teach new skills to the thousands of agricultural workers who only work part of the year. This large pool of people must be trained to become more productive members of society. They deserve a real opportunity to

improve themselves and to share in the fruits of our growing economy.

13 years!

No solution ........................

No plan ..........................

Obviously the Commonwealth is not going to turn things around and make money.

If the sugar industry had the potential to make money, private enterprise wouldn't have abandoned the industry.