STARLIGHT SUGAR INC., Pan
American Grain Mfg. Co.,
Inc., Plaintiffs,

v.

Neftali SOTO, individually and as Secre-
tary of the Department of Agriculture of
the Commonwealth of Puerto Rico, De-
fendant.

Civil No. 95–2078.

United States District Court,
D. Puerto Rico.

Dec. 21, 1995.

See also, 903 F.Supp. 261.

854

Antonio Moreda, San Juan, P.R., Marcos A. Ramírez, Old San Juan, P.R., for Plaintiffs.

Anita Hill–Adames, Federal Litigation Division, Dept. of Justice, San Juan, P.R., for Defendant.

## *OPINION AND ORDER*

PEREZ–GIMENEZ, District Judge.

Through the random operation of our district's case assignment system, this is the second time in seven years that this Court has presided over a constitutional challenge to Puerto Rico's government-operated sugar industry. *See García v. Bauzá Salas*, 686 F.Supp. 965 (D.P.R.), *rev'd on other grounds*, 862 F.2d 905 (1st Cir.1988).[1] In *Bauzá Salas*, the Court found that the Puerto Rico Department of Agriculture's ("the Department's") Market Regulation 13, which limits the importation of sugar to Puerto Rico, violated the Commerce Clause "in its dormant state," Art. I, § 8, cl. 3, of the United States Constitution. *Id.* at 973.

The same regulation is challenged in this case, and the Court reaches the same conclusion it did seven years ago. Regulation 13 imposes unconstitutional restrictions on inter-state commerce. Moreover, Regulation 13 is not rationally related to a legitimate government objective and, therefore, violates the equal protection guarantees of the Fourteenth Amendment. Accordingly, plaintiff's request for injunctive relief from the Secretary's enforcement of Regulation 13 is **GRANTED.**

## I. *Background*

Like cotton in the southern United States, sugar occupies a unique place in the cultural and economic history of Puerto Rico. From the late 1800s through the 1940s, sugar cane was far and away the most important agricultural commodity produced on the Island. Raymond Carr, *Puerto Rico: A Colonial Experiment* 222. The industry's political influence was even greater, as "King Sugar" exerted a disproportionate influence on the United States' early governance of Puerto Rico. Arturo Morales Carrión, *Puerto Rico: A Political and Cultural History* 137–38, 174. Further, much of the Island's rural heritage is closely linked to life in the sugar cane fields.

For the past forty years, however, the sugar industry has been in a continual state of decline.[2] By the early 1970s, private industry had abandoned sugar production in Puerto Rico altogether because it was no longer profitable. *Bauzá Salas*, 686 F.Supp. at 974 (appendix). In 1973, the Commonwealth government established the Sugar

---

1. The rationale for the Court of Appeals' reversal was overruled in *Dennis v. Higgins*, 498 U.S. 439, 451, 111 S.Ct. 865, 872, 112 L.Ed.2d 969 (1991) (holding that 42 U.S.C. § 1983 is a permissible cause of action for claims under the Commerce Clause). *See Bauzá Salas*, 862 F.2d at 909.

2. The following data illustrates this decline:

| Year | Acreage Devoted to Sugar Production[1] | Production[2] | $ Value[3] |
|------|-----------------------------------------|---------------|------------|
| 1890 | 70 | 103 | 4.7 |
| 1910 | 145 | 350 | 23.5 |
| 1920 | 240 | 485 | 98.9 |
| 1950 | 367 | 1,286 | 100.8 |
| 1970 | 189 | 455 | 52.6 |
| 1980 | 85 | 175 | 56.1 |

[1] thousands of acres
[2] thousands of tons
[3] millions of dollars (*not* adjusted for the effects of inflation)

Source: *Puerto Rico A–Zeta*, Agriculture, p. 30.

Corporation of Puerto Rico to fill the void left by the flight of private industry.[3]

Despite the Puerto Rico government's direct subsidization of the industry, sugar cane production on the island has continued to decline. In 1973, approximately 150,000 acres of land were devoted to sugar production, and 12 to 14 sugar mills were in operation on the island. Transcript at 162 (Vélez Ramos Testimony); *see also* footnote 2. By 1988, only 50,000 acres were devoted to sugar production. *Bauzá Salas*, 686 F.Supp. at 974. This figure has declined to 25,000 acres today, with only three mills remaining in operation. Further, whereas the industry employed some 14,000 workers in 1988, it now only employs between 8,000–10,000 persons.[4] Transcript at 163–66 (Vélez Ramos Testimony).

This history provides the context for the Department's amendment in 1984 of Regulation 13. *See Bauzá Salas*, 686 F.Supp. at 966, 972–73. The amended regulation restricts the importation of refined sugar by prohibiting the repackaging of bulk shipments into two and five pound bags (hereafter referred to as "table sugar") for subsequent direct sale to Puerto Rico's consumers. Specifically, section 6 of Market Regulation 13 provides, in pertinent part:

A. Refined sugar to be imported in Puerto Rico shall come in consumer size packages inside the corresponding shipping containers. For the purposes of this Regulation a consumer size package is that one whose net content does not exceed five (5) pounds.

B. ... Imported refined sugar for industrial use shall not be repacked in consumer-size packages for direct sales to the consumers.

Regulation 13 is, concededly, not an absolute prohibition on the importation of table sugar. Theoretically, sugar could still be imported pre-packed in two and five pound bags. However, such importation is not economically feasible. Transcript at 233–36 (López Gómez Testimony). Also, bulk raw sugar could be imported for subsequent refinement. However, the Sugar Corporation owns and operates the only sugar refinery in Puerto Rico, and economic considerations make it unlikely that a new refinery could be built to process imported raw sugar. As the Acting Executive Director of the Sugar Corporation admitted, Regulation 13 effectively prohibits the importation of table sugar to the Island. Transcript at 142 (Vélez Ramos Testimony).

The events precipitating the instant challenge occurred in the fall of 1994, when the government forecasted an impending shortage of Puerto Rico-produced sugar. The Department solicited bids from private industry to help make-up the deficit. Transcript at 240–42 (Defendant Soto's Testimony). The subsequent events are disputed by the parties, but are frankly not germane to the question before the Court. Suffice it to say that co-plaintiff Pan American Grain imported approximately 80 thousand pounds of sugar so that its wholly-owned subsidiary, co-plaintiff Starlight Sugar, could repackage it for consumer sales. The government emphatically denies ever seriously considering granting plaintiffs a waiver to Regulation 13. *Id.*

After media coverage of plaintiffs' intention to sell table sugar to grocery stores on the Island, the Department issued an administrative detention order, pursuant to Regulation 13, prohibiting plaintiffs from doing so. Plaintiffs subsequently initiated this litigation. They seek declaratory and injunctive relief, asserting the constitutional inval-

---

3. The Sugar Corporation is a public corporation, but with a separate and distinct legal personality apart from the Government of Puerto Rico. *Sugar Corporation of Puerto Rico v. Environeering, Inc.*, 520 F.Supp. 996, 998–99 (D.P.R.1981) (citing P.R.Laws Ann. tit. 28, § 242(c)). The Sugar Corporation arranges the refinement and distribution of Puerto Rico-produced sugar to the island's consumers. It is subject to all the Commonwealth's regulations of the sugar industry, including the one at issue in this case. Tran-

script at 240–60 (Defendant Soto's Testimony). The Sugar Corporation is not a party to this suit.

4. The witnesses differed on the number of persons employed in the sugar industry, ranging from 8,000 (cited by the Secretary, Transcript at 279) to 20,000 (cited by José Joaquín Villamil, Transcript at 445). Further, many of the positions are seasonal. These differences are occasionally reflected in this opinion.

idity of Regulation 13. In addition to the Commerce Clause challenge, plaintiffs allege that the Regulation violates the Equal Protection clause of the U.S. Constitution.[5] From September 27, 1995 until October 10, 1995, the Court held a hearing to consider the plaintiffs' contention that Regulation 13 should be declared invalid, and that continued enforcement of it should be enjoined.

## II. Jurisdictional Prerequisites

The Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and § 1343. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Plaintiffs seek relief under 42 U.S.C. § 1983 and 28 U.S.C. § 2201 and § 2202.

In passing, the Court notes that a large portion of plaintiffs' brief is devoted to arguing why the Court should *not* abstain from deciding this case. Plaintiff undoubtedly anticipated that the Secretary would urge abstention. However, he has not done so. (The Court ordered simultaneous briefings so the parties had to anticipate each other's arguments.) Therefore, there is no reason on the record why the Court should abstain from considering and resolving the issues before it.

## III. Discussion

■ The standard for granting a preliminary injunction is well-known. A district court must undertake a four-part analysis that takes into account the following considerations: (1) the movant's likelihood of success on the merits, (2) the potential for irreparable injury, (3) a balancing of the relevant equities, and (4) the effect on the public interest. *Sunshine Development, Inc. v. F.D.I.C.*, 33 F.3d 106, 110 (1st Cir.1994). Of these four factors, the probability-of-success component is regarded by the First Circuit "as critical in determining the propriety of injunctive relief." *Lancor v. Lebanon Housing Authority*, 760 F.2d 361, 362 (1985).

### a. Likelihood of Success on the Merits [6]

#### 1. The Commerce Clause Challenge

##### i. Governing Law

■ Supreme Court doctrine holds that the negative implications of Congress' power to regulate interstate commerce under the Commerce Clause implicitly limits the power of the states. *West Lynn Creamery, Inc. v. Healy*, —— U.S. ——, 114 S.Ct. 2205, 2211, 129 L.Ed.2d 157 (1994). The Court has characterized its dormant commerce clause jurisprudence as follows:

> This "negative" aspect of the Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.... Thus, state statutes that clearly discriminate against interstate commerce are routinely struck down ... unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism.

**5.** The Complaint makes three other claims, discussion of which is confined to this footnote. The first is plaintiffs' Fifth Amendment "Takings" argument. Pursuant to the detention order, plaintiffs remain in possession of the sugar. They are simply not permitted to do with it as they please, i.e., repack it for consumer sales. Other viable channels for selling the sugar remain available. Thus, the detention order cannot constitute a Taking under the Fifth Amendment.

The second is plaintiffs' contention that Regulation 13 violates their substantive rights under the Due Process clause. However, plaintiffs have no identifiable "liberty interest" in selling sugar to Puerto Rico's consumer market. *See Fireside Nissan, Inc. v. Fanning*, 30 F.3d 206, 219 (1994). This, combined with the Supreme Court's refusal to strike down an economic regulation for violating substantive due process in

almost 50 years, suggests that Regulation 13 survives this Due Process challenge.

The third is plaintiffs' procedural Due Process challenge. Plaintiffs did not press the issue at the hearing, nor in their brief. Thus, they appear to have abandoned the argument. Further, the Secretary has demonstrated that the claim is meritless. Transcript at 417–27 (Migdalia Ramos testimony). Therefore, the claim is denied.

**6.** Because this matter is before the Court on plaintiffs' request for a preliminary injunction, all findings as to the merits of the various issues presented are to be understood as statements of probable outcomes. Repeated reference to this fact is eliminated at each relevant juncture for purposes of brevity and simplicity. *See Planned Parenthood of Massachusetts v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981).

*West Lynn Creamery, Inc.,* at ——, 114 S.Ct. at 2211 (quoting *New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 273–74, 108 S.Ct. 1803, 1807–08, 100 L.Ed.2d 302 (1988)). The constraints of the dormant Commerce Clause apply equally to Puerto Rico. *Trailer Marine Transport Corp. v. Rivera Vázquez,* 977 F.2d 1, 8 (1st Cir.1992) (noting that *"[f]ull economic integration is as important to Puerto Rico as to any state in the Union "*) (emphasis added).

■ The Court has adopted a "two-tiered approach to analyzing state economic regulation under the Commerce Clause." *Healy v. Beer Institute,* 491 U.S. 324, 337 n. 14, 109 S.Ct. 2491, 2500 n. 14, 105 L.Ed.2d 275 (1989). Under this approach, courts must first determine if a state's regulation discriminates on its face by giving economic protection to in-state entities at the expense of out-of-state entities. If so, the statute is deemed per se invalid, justifiable only by a compelling state interest. *City of Philadelphia v. New Jersey,* 437 U.S. 617, 623–24, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978).

If the statute is not facially discriminatory, the Court will proceed to the second tier and balance the incidental burdens imposed on interstate commerce against the benefits to local interests. *Beer Institute,* 491 U.S. at 337 n. 14, 109 S.Ct. at 2500 n. 14. *See Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). This aspect of the analysis, often called the *"Pike* test," has been characterized by the Court as a "more flexible approach." *City of Philadelphia,* 437 U.S. at 624, 98 S.Ct. at 2535.

■ The Supreme Court recognizes that "incidental burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people." *Id.* at 623–24, 98 S.Ct. at 2535. Thus, in *Maine v. Taylor,* 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986), the Court upheld Maine's ban on the import of baitfish, despite substantial evidence of the ban's discriminatory purpose. The Court accepted the state's argument that such a ban was the most efficient means to safeguard native fish species from parasites not found in Maine waters.

Health and safety justifications are nonetheless subjected to close scrutiny. Thus, in *Dean Milk Co. v. Madison,* 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951), a case with facts similar to our own, the Court invalidated a city ordinance that made it unlawful to sell any milk that had not been processed and bottled within five miles of the city. The Court held that even a barrier to out of state goods that is motivated by *bona fide* safety or health concerns will be struck down on Commerce Clause grounds if reasonable nondiscriminatory alternatives are available.

■ Although the legitimacy of a state's asserted justification for discriminatory regulation must be evaluated on a "case-by-case analysis of purposes and effects," *West Lynn Creamery,* —— U.S. at ——, 114 S.Ct. at 2215, the Court has made clear that the promotion of in-state business by discriminating against non resident competitors "is not a legitimate state purpose." *Metropolitan Life Insurance Co. v. Ward,* 470 U.S. 869, 880, 105 S.Ct. 1676, 1682, 84 L.Ed.2d 751 (1985) (holding in the context of Equal Protection Clause analysis). Similarly, the Court has held that parochial environmental and land preservation concerns will not justify measures that discriminate against interstate commerce. *West Lynn Creamery,* —— U.S. at —— n. 20, 114 S.Ct. at 2218 n. 20.

### ii. Application of Commerce Clause Jurisprudence

■ Regulation 13 operates to burden interstate commerce in at least two distinct ways. First, by prohibiting the importation of bulk refined sugar for subsequent repackaging, Regulation 13 operates as an "importation restriction" of the sort that has routinely been struck down by the Supreme Court. *See* Ronald D. Rotunda and John E. Nowak, 2 *Treatise on Constitutional Law: Substance and Procedure, 2nd,* § 11.8 at 25–38.

The second effect is a corollary of the first. Since the only way to enter the table sugar market is to import raw sugar and refine it in Puerto Rico, Regulation 13 "is just one more instance of local processing requirements that we have long held invalid." *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.,*

—— U.S. ——, ——, 114 S.Ct. 1677, 1682, 128 L.Ed.2d 399 (1994). After an instructive string cite, *C & A Carbone* explains that "[t]he essential vice in laws of this sort is that they bar the import of the processing service. Out-of-state meat inspectors, or shrimp hullers, or milk pasteurizers [or sugar refiners] are deprived of access to local demand for their services." *Id.* at ——, 114 S.Ct. at 1683.

The Secretary does not dispute that Regulation 13 has these effects. In defense, he asserts that (1) Regulation 13 is non-discriminatory, thereby requiring application of the "more flexible" *Pike* test, and (2) the benefits accruing from the Regulation outweigh the burden it places on interstate commerce.

At the outset the Court must address the threshold question of whether Regulation 13 is discriminatory. The Secretary's argument is briefly stated in one paragraph, *see* Commonwealth Brief at 17, and its brevity has obscured its logic. Two interpretations are possible: (1) that Regulation 13 does not violate the dormant Commerce Clause because plaintiffs are Puerto Rico residents, and, therefore, essentially lack standing to claim the doctrine's protection; or (2) that Regulation 13 is non-discriminatory because it applies equally to all businesses, whether they are residents of the Commonwealth or not.

Whichever argument is intended, neither is persuasive. Plaintiffs seek to import and sell sugar that is cultivated and refined outside of Puerto Rico. Regulation 13 prevents the plaintiffs from doing so because of the very fact of the sugar's non-Puerto Rico origins. Thus, the Regulation discriminates between Puerto Rico and non-Puerto Rico sugar in a manner that is fatal for would-be importers of the latter.

To argue that Regulation 13 is non-discriminatory because it "neutrally" limits the prospects of both in-state-importers and out-of-state importers—neither may import non-Puerto Rico produced sugar—is to misconstrue the policy of the dormant commerce clause. The doctrine is not aimed simply at protecting "out-of-staters" in the manner, for example, of the federal courts' diversity jurisdiction. Rather, it is designed to "foster economic integration and prevent local interference with the flow of the nation's commerce." *Trailer Marine*, 977 F.2d at 8. The doctrine protects and advances the interests of *all* of the citizens of the United States, not just the parties in a particular dispute. *See H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 539, 69 S.Ct. 657, 665, 93 L.Ed. 865 (1949) ("every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any").

Regulation 13 effectively denies Puerto Rican consumers access to sugar produced outside the Commonwealth. This is not the ancillary effect of some legitimate state objective, but rather the regulation's avowed purpose. See discussion page 860. Thus, simply because plaintiffs are Puerto Rico entities does not diminish their right to bring this suit.[7] *See, e.g., West Lynn Creamery, supra* (Massachusetts entities successfully challenged a Massachusetts regulation that burdened the importation of milk produced outside of Massachusetts).

Thus, Regulation 13, on its face, discriminates against interstate commerce.[8] The regulation is, therefore, "per se invalid," unless the Secretary "can demonstrate, under rigorous scrutiny, that [Puerto Rico] has no other means to advance a legitimate local

---

7. That plaintiffs' sugar was imported from Brazil does not alter the analysis. First, of course, it has no bearing on plaintiffs' facial challenge. Second, because the regulation requires "local processing," it restricts importation of the *service* without regard to the sugar's place of origin. Third, and perhaps most importantly, plaintiffs are U.S. citizens whose business interests are frustrated by local regulations which further purely parochial protectionist interests. Given the Court's broad definition of inter-state commerce, *see, e.g., Wickard v. Filburn*, 317 U.S. 111,

63 S.Ct. 82, 87 L.Ed. 122 (1942), the dormant commerce clause should be operable here.

8. Even if Regulation 13 could be characterized as nondiscriminatory—which no amount of inventiveness would seem to permit—it would still not survive Commerce Clause scrutiny since, as discussed below, the protection of the local industry is the only asserted justification for the repackaging prohibition. *See Pike*, 397 U.S. at 142, 90 S.Ct. at 847.

interest." *C & A Carbone,* —— U.S. at ——, 114 S.Ct. at 1683.

The Secretary advances a number of justifications for the regulation. One justification that is conspicuous by its absence, however, is any serious contention that Regulation 13 advances important health and safety interests. As a matter of litigation strategy, the omission is curious, since as noted above, the few facially discriminatory regulations that have survived commerce clause scrutiny have all involved such claims. Further, the talismanic "health and safety" argument was the principal justification advanced by the government in the 1988 litigation. *Bauzá Salas,* 686 F.Supp. at 972–74.

Of course, the fact that the argument is unsustainable might be one reason the Secretary chose not to make it. As noted eight years ago, prior to the promulgation of the section of Regulation 13 challenged here, sugar was regularly imported in bulk and repackaged in consumer-sized packages, without any "complaints, that we know of, as to the quality of [the] sugar." *Id.* at 972. It was also pointed out that there were measures less burdensome on inter-state commerce, besides the repackaging prohibition, that could be implemented to further the Department's "wholesomeness" concerns. *Id.* at 973–74. *See Dean Milk, supra.*

Evidence adduced during the preliminary injunction hearing this time around further illuminates the hollowness of the "health and safety" argument. It is true that section V of Regulation 13 establishes minimum quality standards for sugar brought into Puerto Rico. It was established at the hearing, however, that the Department conducts no "wholesomeness" inspections of sugar whatsoever. Those inspections that are done are undertaken by the Puerto Rico Department of Health pursuant to the Department of Health's own regulations, and it is the Department of Health—not the Department of Agriculture—that issues licenses for the importation of sugar to Puerto Rico. *See* Transcript at 42–51 (Picó Seda Testimony); Transcript at 304–306 (González Freyre Testimony).

Thus, as implemented by the Department, Regulation 13 has little or nothing to do with the quality of sugar. The Secretary conceded this when he answered "Yes" to the following question posed by plaintiff's counsel: "Isn't it a fact that the most important purpose of ... regulation [13] is to protect the Sugar Corporation from competition?" Transcript at 242–43. Elsewhere, the Secretary stated that Regulation 13 "protect[s] the market of two and five pound packaging that has ... traditionally [belonged to] the Sugar Corporation." Transcript at 278. Ending the regulation's protection of the sugar industry, the Secretary asserted, "would be equivalent to the death of the sugar industry in Puerto Rico." *Id.* He cited Puerto Rico's relatively high production costs, and the better growing conditions of other sugar producers, as the basis for his lack of optimism. Transcript at 279–80.

Thus, the Secretary admitted that Regulation 13 operates *by design* to exclude sugar produced outside Puerto Rico in order to protect an industry that could not otherwise survive. Nonetheless, the Secretary asserts that Regulation 13 "does not amount to simple economic protectionism." Secretary's Brief at 10. To support this contention the Secretary cites the many benefits which flow from the Commonwealth's protection of the sugar industry. These include: (1) protection of Puerto Rico's second largest agricultural industry; (2) "8 to 12,000" jobs; (3) maintenance of the land, investment and income devoted to and generated by the sugar industry; (4) maintaining a viable rural economy; (5) economic self-sufficiency; (6) general quality of life. Secretary's Brief at 15.

This list, of course, explains the many reasons *why* the Puerto Rico government *wants* to protect its domestic sugar industry. It does not, however, distinguish the government's policy from "simple economic protectionism." Further, the Court finds that the government's non-economic justifications are purely speculative, if not outright contradicted by the evidence. Though the repackaging prohibition has been in place for over a decade, the domestic sugar industry—both in terms of acreage devoted to sugar production, and persons employed by the industry—continues to decline. Thus, the non-economic considerations asserted by the Secretary can

not justify the burden on interstate commerce imposed by Regulation 13.

### iii. Summary of Commerce Clause Analysis

The findings of the Court up to this point can be summarized as follows: (1) Regulation 13 facially discriminates against interstate commerce; (2) the Secretary has failed to assert a compelling interest, aside from economic protectionism, to justify Regulation 13's discriminatory purpose and effect; (3) therefore, Regulation 13 violates the Commerce Clause of the United States Constitution. *City of Philadelphia,* 437 U.S. at 624, 98 S.Ct. at 2535; *C & A Carbone,* ––– U.S. at –––, 114 S.Ct. at 1683.

### 2. The Equal Protection Challenge

The Supreme Court has noted the "connection between the rationality analysis under the Equal Protection Clause and the balancing of interests under the Commerce Clause." *Minnesota v. Clover Leaf Creamery,* 449 U.S. 456, 470 n. 14, 101 S.Ct. 715, 727 n. 14, 66 L.Ed.2d 659 (1981). Thus, much of the preceding discussion is applicable here, and need not be repeated.

■ The standard courts must apply in an Equal Protection claim is well known: "Absent a suspect classification or a fundamental right, courts will uphold economic and social legislation that distinguishes between two similarly situated groups as long as the classification is rationally related to a legitimate government objective." *Fireside Nissan Inc. v. Fanning,* 30 F.3d 206, 219 (1st Cir.1994) (citations omitted).

■ Regulation 13 distinguishes between local producers of sugar and out-of-state producers who wish to import. The former can pack sugar for direct sale to consumers while the latter cannot. The Secretary asserts that this distinction is made in order "to protect the local sugar industry." Secretary's Brief at 25. As we have seen, however, this is not a legitimate government objective. *Metropolitan Life Insurance Co.,* 470 U.S. at 880, 105 S.Ct. at 1683.

The Equal Protection analysis need go no further. Because the distinction made by the Regulation fails to further a legitimate government objective, the Court finds that it would likely be found unconstitutional at a full trial on the merits. Plaintiffs' claim, therefore, satisfies the "likelihood of success" requirement for a preliminary injunction.

### b. The Potential for Irreparable Injury

Plaintiffs assert they will suffer irreparable injury unless the preliminary injunction is granted because: (1) they will lose the opportunity to enter and supply a significant percentage of the table sugar market; and (2) the deprivation of their constitutional rights—as established above—constitutes irreparable injury in and of itself. Plaintiffs' Brief at 3–4.

Addressing the latter argument first, a well known treatise, cited by plaintiffs, states that, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." 11A Wright & Miller, *Federal Practice and Procedure:* Civil 2d § 2948.1 at 161. The rule in our Circuit, however, is not so clear cut. In *Public Serv. Co. of New Hampshire v. Town of West Newbury,* 835 F.2d 380, 382 (1st Cir.1987), the Court observed that cases holding that the deprivation of a constitutional right constitutes a sufficient showing of irreparable harm "are almost entirely restricted to cases involving alleged infringements of free speech." The Court further noted that even the assertion of "First Amendment rights does not *automatically require* a finding of irreparable injury." *Id.* (emphasis added). More recently, however, the Court appeared to accept a plaintiff's assertion that the deprivation of constitutional rights guaranteed by the dormant commerce clause would constitute irreparable injury. *Fireside Nissan,* 30 F.3d at 211 (citations omitted).

■ A recent, well-reasoned opinion from another district surveyed the cases and concluded that there was no general rule. *Atlantic Coast Demolition and Recycling Inc. v. Board of Chosen Freeholders of Atlantic County,* 893 F.Supp. 301, 308–09 (D.N.J. 1995). The Court opined that the lack of a bright line rule was appropriate given the

equitable nature of injunctive relief, and that the best approach is to consider the deprivation of a plaintiff's rights under the dormant commerce clause (or any other constitutional provision) as *a factor* in assessing irreparable injury. The ensuing analysis of plaintiffs' claim of irreparable injury follows the approach suggested in *Atlantic Coast Demolition.*

 Plaintiffs' other irreparable injury argument depends on the effect Regulation 13 has on their businesses. For the purposes of a preliminary injunction, however, there is no "irreparable injury where only money is at stake and where plaintiff has a satisfactory remedy at law to recover the money at issue." *Foxboro Co. v. Arabian American Oil Co.,* 805 F.2d 34, 36 (1st Cir. 1986). On the other hand, recognizing that "timing is everything" in business, the First Circuit has recognized that the frustration of a business opportunity can constitute irreparable injury. *Hyde Park Partners v. Connolly,* 839 F.2d 837, 853 (1st Cir.1988).

Here, plaintiffs do make a purely monetary argument: Lost profits from unconsummated sales to the consumer market, they argue, cannot be recouped from sales in other markets. As volume sellers, they could make such sales anyway. This purely monetary argument does not constitute irreparable injury for the purposes of a preliminary injunction.

Plaintiffs also point out, however, that they are singularly situated to enter the consumer table sugar market at this time. There is an impending shortage of Puerto Rico produced sugar. Grocery stores will need to look elsewhere than to their regular supplier, the Sugar Corporation, to meet their customers' demands. This is a unique opportunity for plaintiffs to establish the necessary business relationships for the future. The operation of Regulation 13 frustrates this opportunity. Transcript at 308–10 (González Freyre testimony). The Court finds that this argument, together with plaintiffs' showing that Regulation 13 violates their constitutional rights, supports plaintiffs' contention that a preliminary injunction is necessary to avert irreparable injury.

### c. Balancing of the Relevant Equities and the Effect on the Public Interest

The last two factors also weigh in the favor of plaintiffs. The government's interest in maintaining its state-run monopoly is clearly outweighed by the plaintiffs' interest in exercising their Constitutional right to try to participate in that market. Further, as we have seen, the putative public benefits which accrue from Regulation 13 are speculative at best, if not illusory. The harm it engenders, however, is well-documented. Puerto Ricans pay more for sugar than they would otherwise.

I also find speculative the government's assertion of the damage that will result from granting the injunction. The Secretary has not definitively shown that the invalidation of Regulation 13 necessarily means the death knell of the Puerto Rico sugar industry. Perhaps the competition might be the spur the industry needs to enable it to compete.

Thus, the Court finds that the last two prongs of the requirements for a preliminary injunction are satisfied.

### V. Conclusion

As the above discussion demonstrates, plaintiffs would likely prevail on their contention that Regulation 13 is unconstitutional. Plaintiffs have also demonstrated that continued implementation of Regulation 13 will cause them irreparable injury. Furthermore, consideration of the comparative equities and of the public interest both weigh in favor of plaintiffs. **Therefore,** in light of these findings and the special emphasis placed on the "likelihood of success" prong by the First Circuit, the Court finds that plaintiffs' suit for a preliminary injunction must be **GRANTED.**

In light of this Opinion and Order, the Court sets a status conference for **January 11, 1996,** to discuss with the parties the approach that should be taken to resolve the remaining matters pending in this case.

**IT IS SO ORDERED.**